## FOK YUNG YO v. UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF CALIFORNIA.

No. 478.　Argued January 7, 1902.—Decided May 5, 1902.

The power to exclude or expel aliens is vested in the political departments
of the Government, to be regulated by treaty or by act of Congress, and
to be executed by the executive authority according to such regulations,
except so far as the judicial department is authorized by treaty or by
statute, or is required by the Constitution, to intervene.　And this is true
of the privilege of transit.

By the treaty between the United States and China, of 1894, the privilege
of transit across the territory of the United States could only be enjoyed
subject to such regulations of the Government of the United States as
might be necessary to prevent the privilege from being abused.

The treaty, in recognizing the privilege and providing that it should con-
tinue, proceeded on the ground of its existence and continuance under
governmental regulations, and no act of Congress was required to carry
it into effect.

Under existing regulations the action of the collector of customs in refus-
ing transit cannot be interfered with by the courts.

THIS was a petition to the District Court of the United States
for the Northern District of California for a writ of *habeas cor-
pus.*　The petition represented that the petitioner was a citizen
of the Empire of China, and a resident of Guatemala in the
Republic of Mexico, and was travelling to that place when in-
terrupted in his journey as afterwards described; that on Au-
gust 24, 1901, he purchased, for the sum of 183 Mexican dollars,
from the agent of the Japanese steamship company of the Toyo
Kisen Kaisha at Hong Kong in China, passage thence to San
José de Guatemala in Mexico, and received from said agent a
ticket for passage on the steamship Nippon Maru to the port
of San Francisco, and an order upon the San Francisco agent
of said company for a steerage ticket from San Francisco to
San José de Guatemala ; that upon arriving in the port of San
Francisco he was, on September 19, 1901, examined by a cus-
toms inspector, his baggage and private papers opened, and his

person searched; that, after the examination of the petitioner, the collector of customs at the port made an order of deportation, denying him the privilege of transit, and he was, by virtue of that order, detained by the agent of the steamship company in a frame building on the Pacific Mail dock at San Francisco, and, unless released by the court, would be deported and sent back to China; that the petitioner was not making application to enter the United States, or to pass in transit through the territory thereof, but was merely a passenger en route for a foreign port, and touching at the port of San Francisco while on his journey along the usual course of travel, and for the purpose of transshipping to another vessel; that the order under which he was held was illegal and void, and not authorized by any law of the United States, or by any treaty between the United States and the Empire of China; and that the collector of customs had no authority under the law to examine or to confine the petitioner.

The District Attorney, by leave of court, intervened in behalf of the United States, and suggested that the petitioner was a native of the Empire of China, and a laborer by occupation, and before the filing of his petition arrived at San Francisco from Hong Kong in transit, through the territory of the United States, for the Republic of Mexico; that the collector of customs for the port of San Francisco, after careful and due investigation, had decided that he was satisfied that the petitioner did not intend in good faith to continue his voyage through the territory of the United States to the Republic of Mexico, and had for that reason denied him the privilege further to continue his journey through the territory of the United States, and had ordered him deported to China; and that the court had no jurisdiction over the person of the petitioner, or over the subject matter of this proceeding.

The parties submitted the case to the decision of the court upon the following facts: "The petitioner is a subject of the Empire of China. He arrived at the port of San Francisco on the Japanese steamship Nippon Maru, the manifest of which vessel states that he intended to go to San José de Guatemala. Petitioner herein also alleges that that was his intended destina-

tion. The collector of customs at the port of San Francisco did, on September 23, 1901, deny the petitioner the privilege of further pursuing his journey to his alleged point of destination. The petitioner has a ticket, or an order for a ticket, for a through passage from Hong Kong, China, to San José de Guatemala by steamer. The petitioner is now held by W. H. Avery, agent for the Japanese steamship company, by virtue of an order issued by the collector of customs for the port of San Francisco, directing him to retain the person of the petitioner in his custody, and deport him to China."

The court ordered the petition and the writ of *habeas corpus* to be dismissed, and the petitioner remanded to custody; and he appealed to this court.

*Mr. Maxwell Evarts* for appellant.

*Mr. Assistant Attorney General Hoyt* for appellee.

Mr. Chief Justice Fuller delivered the opinion of the court.

The facts upon which the parties submitted the case to the decision of the court below do not include, on the one hand, the statement of the petition that the petitioner was examined by a customs inspector, his baggage and papers opened, and his person searched; nor, on the other hand, the statements in the intervention of the United States, that the petitioner was a laborer by occupation, and that the decision of the collector for his detention and deportation was made after due and careful investigation, and for the reason that he was satisfied that the petitioner did not intend in good faith to continue his voyage through the territory of the United States to the Republic of Mexico. But the facts agreed are simply that the petitioner was a subject of the Empire of China, arriving at the port of San Francisco, whose intended destination, as appeared by the manifest of the vessel in which he arrived, and by his own allegation, was San José de Guatemala in the Republic of Mexico, and who had a ticket, or an order for a ticket, for a through passage from Hong Kong, China, to San José de Guatemala by

steamer; and that the collector of customs at San Francisco denied him the privilege of further pursuing his journey to his alleged point of destination, and issued an order directing him to be detained and deported to China.

The whole question in the case, therefore, is whether this denial and order of the collector were authorized by law.

Before the treaty of 1894 between the United States and China, the privilege of transit of Chinese persons across the territory of the United States was not specifically mentioned in any treaty or statute, except in the last clause of section 8 of the act of September 13, 1888, c. 1015, by which the Secretary of the Treasury was authorized to make, and from time to time to change, "such rules and regulations, not in conflict with this act, as he may deem necessary and proper to conveniently secure to such Chinese persons as are provided for in articles second and third of" a treaty between the United States and China, signed March 12, 1888, but not then ratified, "the rights therein mentioned and such as shall also protect the United States against the coming and transit of persons not entitled to the benefit of the provisions of said articles." 25 Stat. 478. As that treaty was never ratified, it may be doubtful whether that section ever took effect. See *Li Sing* v. *United States*, 180 U. S. 486, 490; *United States* v. *Gee Lee*, 50 Fed. Rep. 271.

But such privilege of transit was recognized by successive Attorneys General from 1882 to January, 1894; (17 Opinions, 416, 485; 18 Opinions, 388; 19 Opinions, 369; 20 Opinions, 693;) and it was regulated by orders of the Treasury Department.

By regulations of Secretary Folger of January 23, 1883, it was provided that "where a Chinese consul resides at the port of landing or entrance into the United States by any Chinese laborer claiming to be merely in transit through the territory of the United States in the course of a journey to or from other countries, the certificate of such Chinese consul, identifying the bearer by name, height, age, etc., so far as practicable, and showing the place and date of his arrival, the place at which he is to leave the United States, the date when his journey is to begin, and that it is to be continuous and direct, shall be accepted as

*prima facie* evidence;" that, "in the absence of such certificate, other competent evidence to show the identity of the person, and the fact that a *bona fide* transit only is intended, may be received;" and that "the production of a through ticket across the whole territory of the United States intended to be traversed may be received as competent proof, and should be exhibited to the collector and verified by him. Such tickets and all other evidence presented must be so stamped or marked and dated by the customs officer as to prevent their use a second time."

By regulations of Secretary McCulloch of January 14, 1885, the regulations of January 23, 1883, "relative to the transit of Chinese laborers through the territory of the United States, will be applied to all Chinese persons intending to so go in transit through the United States;" and "Chinese persons who may be compelled to touch at the ports of the United States in transit to foreign countries may be permitted to land under the regulations of January 23, 1883, so far as the same may be applicable, such persons to take passage by the next vessel leaving for their destination, or the voyage of which may form part of the route necessary to carry them to their destination."

By regulations of Secretary Windom of September 28, 1889, "any Chinese laborer claiming to be in transit through the territory of the United States, in the course of a journey from and to other countries, shall be required to produce to the collector of customs at the first port of arrival a through ticket across the whole territory of the United States intended to be traversed, and such other proof as he may be able to adduce, to satisfy the collector of the fact that a *bona fide* transit only is intended; and such ticket and other evidence presented must be so stamped, or marked, and dated by the customs officer as to prevent their use the second time;" a bond in the penal sum of $200 was required for each Chinese laborer, "conditioned for his transit and actual departure from the United States within a reasonable time, not exceeding twenty days from the date of arrival;" and previous regulations on the subject were rescinded.

By article 3 of the treaty between the United States and China

of March 17, 1894, it is "agreed that Chinese laborers shall continue to enjoy the privilege of transit across the territory of the United States in the course of their journey to or from other countries, subject to such regulations by the Government of the United States as may be necessary to prevent said privilege of transit from being abused." 28 Stat. 1211. That article was also in the unratified treaty of 1888.

On December 8, 1900, Secretary Gage issued regulations amendatory of the regulations of September 28, 1889, and addressed "to collectors of customs and all other officers charged with the enforcement of the Chinese exclusion laws," the material parts of which were as follows :

"Complaints having reached the Department of attempted violations of the laws enacted for the exclusion of Chinese by those who have been allowed to pass through the United States to foreign territory, the following rules are hereby adopted for your guidance in granting permission for such transit :

" Any Chinese person arriving at your port, claiming to be destined to some foreign country, and seeking permission to pass through the United States, or any portion thereof, to reach such alleged foreign destination, shall be granted permission for such transit only upon complying with the following conditions :

"1. The applicant shall be required to produce to the collector of customs at the first port of arrival a through ticket across the whole territory of the United States (and to his or her alleged foreign destination according to the steamship manifest) intended to be traversed, and such other proof as he (or she) may be able to adduce, to satisfy the said collector that a *bona fide* transit only is intended ; and such ticket and other evidence presented must be so stamped, or marked, and dated by the said collector, or such officer as he shall designate for that purpose, as to prevent their use a second time ; but no such applicant shall be considered as intending *bona fide* to make such transit only, if he (or she) has previously, on same arrival, made application for and been denied admission to the United States.

"2. The applicant in each case, or some responsible person on his (or her) behalf, or the transportation company whose

through ticket he (or she) holds, shall furnish to the said collector of customs a bond in a penal sum of not less than $500, conditioned for applicant's continuous transit through, and actual departure from, the United States within a reasonable time, not exceeding twenty days from the date of arrival at said port."

These regulations repeat the requirements of those of 1889, (which took the place of previous regulations,) that evidence must be produced to satisfy the collector " that a *bona fide* transit only is intended." Clearly in the absence of provision for review his decision is final.

The doctrine is firmly established that the power to exclude or expel aliens is vested in the political departments of the Government, to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to such regulations, except so far as the judicial department is authorized by treaty or by statute, or is required by the Constitution, to intervene. *Fong Yue Ting* v. *United States*, 149 U. S. 698 ; *Lem Moon Sing* v. *United States*, 158 U. S. 538 ; *Li Sing* v. *United States*, 180 U. S. 486.

And as a general proposition this must be true of the privilege of transit. The underlying principle is thus stated by Kent, (vol. 1, p. 35): " Every Nation is bound, in time of peace, to grant a passage, for lawful purposes, over their lands, rivers, and seas, to the people of other States, whenever it can be permitted without inconvenience ; and burthensome conditions ought not to be annexed to the transit of persons and property. If, however, any government deems the introduction of foreigners, or their merchandise, injurious to those interests of their own people which they are bound to protect and promote, they are at liberty to withhold the indulgence. The entry of foreigners and their effects is not an absolute right, but only one of imperfect obligation, and it is subject to the discretion of the government which tolerates it."

In short, the privilege of transit, although it is one that should not be withheld without good cause, is nevertheless conceded only on such terms as the particular Government prescribes in

view of the well-being of its own people. If then these regulations have the force of law, they bind the courts.

The first article of the treaty of December 8, 1894, provides that "the coming, except under the conditions hereinafter specified, of Chinese laborers to the United States shall be absolutely prohibited." The second paragraph of article three reads: "It is also agreed that Chinese laborers shall continue to enjoy the privilege of transit across the territory of the United States in the course of their journey to or from other countries, subject to such regulations by the Government of the United States as may be necessary to prevent said privilege of transit from being abused."

We regard this as explicitly recognizing existing regulations, and as assenting to their continuance, and to such modification of them as might be found necessary to prevent abuse. It dealt with the subject specifically, and was operative without an act of Congress to carry it into effect.

The treaty of 1880, 22 Stat. 826, in declaring in respect of the coming of Chinese laborers into this country that the Government of the United States might "regulate, limit or suspend such coming or residence," did not refer to the privilege of transit, and, as it was not self-executing, the act of May 6, 1882, was passed to carry the stipulation into effect. But the provision of this treaty applicable here, in recognizing the privilege of transit and providing that it should continue, proceeded on the ground of its existence and continuance under governmental regulations, and no act of Congress was required. *Lee Gon Yung* v. *United States*, 111 Fed. Rep. 998.

Nor is the provision open to the ingenious construction suggested, that it is only after transit has commenced that the privilege may be abused. The abuse of the privilege might consist in the use of passage across the country to reach a point from which to effect an entrance into it, contrary to law. The journey contemplated would in effect be continuous, and the intermediate destination could not absolve from the guilt involved in the effort to attain that forbidden ulterior destination. Such an abuse of the privilege could only be prevented by arresting the journey on the threshold.

Necessarily the collector's decision could not be controlled by the bare production of a through ticket to a point in foreign territory. The very question to be determined is good faith in the transit, and good faith would be lacking if that transit were merely a means of effecting admission into the United States. And the decision of the Treasury Department as to the right of admission is made final by statute.

For instance, it is difficult, if not impossible, to police effectively the long frontier between the United States and Mexico, and if, in a given case, a Chinese laborer arrives at San Francisco ostensibly bound to a port in Mexico, but going there for the purpose of crossing thence into this country, this would be an abuse of the privilege, and denial of transit would be justified. And this, in cases where such is the intent and purpose, is in accordance with the terms of the treaty, and not in the exercise of a general power to prohibit that which the treaty permits.

By the act of August 18, 1894, 28 Stat. 390, the decision of the proper executive officer, if adverse to an alien's admission, was made final unless reversed on appeal to the Secretary of the Treasury.

That act came under consideration in *Lem Moon Sing* v. *United States*, 158 U. S. 538. Petitioner contended that while the immigration officers had authority to exclude aliens from coming into the United States, yet if an alien was entitled of right to enter the country, and was nevertheless excluded by such officers, the latter exceeded their jurisdiction, and the courts might intervene; but Mr. Justice Harlan, speaking for the court, said: " That view, if sustained, would bring into the courts every case of an alien who claimed the right to come into the United States under some law or treaty, but was prevented from doing so by the executive branch of the Government. This would defeat the manifest purpose of Congress in committing to subordinate immigration officers and to the Secretary of the Treasury exclusive authority to determine whether a particular alien seeking admission into this country belongs to the class entitled by some law or treaty to come into the country, or to a class forbidden to enter the United States.

Under that interpretation of the act of 1894 the provision that the decision of the appropriate immigration or customs officers should be final, unless reversed on appeal to the Secretary of the Treasury, would be of no practical value."

So in the case before us, the treaty manifestly operated to commit the subject of transit to executive regulation and determination; and by the then, as well as the present, regulations, the final decision as to permitting transit was devolved on the collector of customs, and no appeal to the Secretary was provided for. In appears from the official documents referred to on the argument that the Treasury Department has "held that neither the treaty nor the laws relating to the exclusion of Chinese, either expressly or by implication, give to Chinese persons refused the privilege of transit the right of appeal;" but possession of the power to grant an appeal, or to supervise the action of the collector in some other appropriate way, in circumstances demanding intervention, has not been disavowed.

This case is an attempt to transfer the inquiry from the collector to the courts. Congressional action has placed the final determination of the right of admission in executive officers, without judicial intervention, and this has been for many years the recognized and declared policy of the country. The regulations to prevent abuse of the privilege of transit have been and are intended to effectuate the same policy, and recourse to the courts by *habeas corpus* to determine the existence of such abuse appears to us equally inadmissible.

The record does not present a case of regulation or action in contravention of the Constitution, and we think that, upon the admitted facts, the orders of the collector cannot be held to have been invalid.

*Order affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissented.