# UNITED STATES ex rel. JOHN TURNER v. WILLIAMS.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 561. Argued April 6, 7, 1904.—Decided May 16, 1904.

Congress has power to exclude aliens from, and to prescribe the conditions on which they may enter, the United States; to establish regulations for deporting aliens who have illegally entered, and to commit the enforcements of such conditions and regulations to executive officers. Deporting, pursuant to law, an alien who has illegally entered the United States, does not deprive him of his liberty without due process of law.

The Alien Immigration Act of March, 1903, 32 Stat. 1213, does not violate the Federal Constitution, nor are its provisions as to the exclusion of aliens who are anarchists, unconstitutional.

A board of inquiry and the Secretary of Commerce and Labor having found that an alien immigrant was an anarchist within the meaning of the Alien

Immigration Act of March 3, 1903, and there being evidence on which to base this conclusion, his exclusion, or his deportation after having unlawfully entered the country, within the period prescribed pursuant to the provisions of the act, will not be reviewed on the facts.

JOHN TURNER filed in the United States Circuit Court for the Southern District of New York, October 26, 1903, a petition alleging—

"First. That on October 23 in the city of New York your relator was arrested by divers persons claiming to be acting by authority of the Government of the United States and was by said persons conveyed to the United States immigration station at Ellis Island in the harbor of New York, and is now there imprisoned by the Commissioner of Immigration of the port of New York.

"Second. Your relator is so imprisoned by virtue of a warrant sworn out by the Secretary of the Department of Commerce and Labor, which warrant charges your relator with being an anarchist and being unlawfully within the United States in violation of section 2 and section 20 of the immigration laws of the United States, as amended by act of March 3, 1903.

"Third. Upon information and belief that a special board of inquiry consisting of Charles Semsey, Captain Weldon, supervising inspector, and L. C. Stewart, all of whom are executive officers of the United States, has inquired into your relator's case and decided that your relator is an anarchist, and is in the United States in violation of law within the meaning of the act of March 3, 1903.

"Fourth. Your relator denies that he is an anarchist within the meaning of the immigration laws of the United States, and states to the court that about six years ago he took out his first papers of application for citizenship in this country, and that he has at no times been engaged as a propagandist of doctrines inciting to or advising violent overthrow of government, but for about six years last past he has been the paid organizer of the retail clerks of Great Britain and his business

in this country is solely to promote the interests of organized labor, and that he has at all times conducted himself as a peaceful and law abiding citizen.

"By reason of all of which facts your relator says that his imprisonment is illegal, in that he is being deprived of his liberty without due process of law and is being denied equal protection of the laws, contrary to the Constitution and laws of the United States."

And praying for a writ of *habeas corpus* to the Commissioner of Immigration of the port of New York, and also for a writ of certiorari to bring up the record of the Board of Inquiry which adjudged him to be an anarchist and in the United States in violation of the immigration laws. The commissioner made return under oath and also certified the record of the Board of Inquiry.

The return stated—

"That the above named John Turner is an alien, a subject of the Kingdom of Great Britain and Ireland; that said alien came to the United States from England on or about ten days prior to October 24, 1903, as deponent is informed and believes.

"Said John Turner was arrested in the city of New York on or about October 23, 1903, under a warrant issued by the Secretary of the Department of Commerce and Labor of the United States, and was taken to the Ellis Island immigration station, where he was examined by a board of a special inquiry, duly constituted according to law, upon his right to remain in this country, and that said alien was by said board found to be an alien anarchist, and was by unanimous decision of said board ordered to be deported to the country from whence he came as a person within the United States in violation of law. That on October 26, 1903, said alien appealed from the said decision of the board of special inquiry to the Secretary of Commerce and Labor, who dismissed the appeal and directed that said alien be deported to the country from whence he came upon the ground that said alien is an anar-

chist and a per on who disbelieves in and who is opposed to all organized government and was found to be in the United States in violation of law.

"That annexed hereto is a copy of the above-mentioned warrant for the arrest and deportation of said John Turner, and copies of the minutes of said hearing before the board of special inquiry, and a copy of the order or decision of the Secretary of Commerce and Labor dismissing said appeal and again directing deportation. That said John Turner is now held in deponent's custody at the Ellis Island immigrant station pending deportation to the country from whence he came in accordance with the above-mentioned decision or order of the Secretary of Commerce and Labor."

The warrant issued by the Secretary was addressed to certain United States immigrant inspectors, and recited that from the proofs submitted the Secretary was satisfied that Turner, an alien anarchist, came into this country contrary to the prohibition of the act of Congress of March 3, 1903, and commanded them to take him into custody and return him to the country from whence he came at the expense of the United States. On appeal to the Secretary the record of proceedings before the board of inquiry was transmitted, and the Secretary held: "The evidence shows that the appellant declined to give exact information as to the manner in which he secured admission to this country, although he swears that he arrived here about ten days ago. He admits that he is an anarchist and an advocate of anarchistic principles, which brings him within the class defined by section 38 of the act approved March 3, 1903. In view of these facts, the appeal is dismissed and you are directed to deport the said John Turner in conformity with warrant now in your hands for execution."

The hearing before the Board of Inquiry was had October 24, 1903, and it appeared from the minutes thereof that Turner testified that he was an Englishman; that he had been in the United States ten days, and that he did not come through New York, but declined to either affirm or deny that he arrived

*via* Canada; that he would not undertake to deny that he had in the lecture delivered in New York, October 23, declared himself to be an anarchist, which, he said, was a statement that he would make; and that the testimony of the inspectors was about correct. That evidence gave extracts from the address referred to including these: "Just imagine what a universal tie-up would mean. What would it mean in New York city alone if this idea of soliditary were spread through the city? If no work was being done, if it were Sunday for a week or a fortnight, life in New York would be impossible, and the workers, gaining audacity, would refuse to recognize the authority of their employers and eventually take to themselves the handling of the industries. . . . All over Europe they are preparing for a general strike, which will spread over the entire industrial world. Everywhere the employers are organizing, and to me, at any rate, as an anarchist, as one who believes that the people should emancipate themselves, I look forward to this struggle as an opportunity for the workers to assert the power that is really theirs."

Certain papers were found on Turner, one of them being a list of his proposed series of lectures, (which, when the warrant was in execution, he rolled up and threw away,) the subjects including: "The legal murder of 1887," and "The essentials of anarchism;" notices of meetings, one of a mass-meeting November 9, at which "Speeches will be delivered by John Turner in English, John Most in German, and several other speakers. Don't miss this opportunity to hear the truth expressed about the great Chicago tragedy on the eleventh of November, 1887;" and another, stating: "It may be interesting to all that Turner has recently refused to accept a candidacy to Parliament because of his anarchistic principles."

A demurrer was interposed to the return, and, after argument, the Circuit Court dismissed the writ and remanded the petitioner. 126 Fed. Rep. 253. From this order an appeal was prayed and allowed to this court, and, having been docketed, petitioner was admitted to bail.

Sections 2 and 38 of the act of March 3, 1903, entitled "An act to regulate the immigration of aliens into the United States," 32 Stat. 1213, c. 1012, are as follows:

"SEC. 2. That the following classes of aliens shall be excluded from admission into the United States: All idiots, insane persons, epileptics, and persons who have been insane within five years previous; persons who have had two or more attacks of insanity at any time previously; paupers; persons likely to become a public charge; professional beggars; persons afflicted with a loathsome or with a dangerous contagious disease; persons who have been convicted of a felony or other crime or misdemeanor involving moral turpitude; polygamists, anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States or of all governments or of all forms of law, or the assassination of public officials; prostitutes, and persons who procure or attempt to bring in prostitutes or women for the purpose of prostitution; those who have been, within one year from the date of the application for admission to the United States, deported as being under offers, solicitations, promises or agreements to perform labor or service of some kind therein; and also any person whose ticket or passage is paid for with the money of another, or who is assisted by others to come, unless it is affirmatively and satisfactorily shown that such person does not belong to one of the foregoing excluded classes; but this section shall not be held to prevent persons living in the United States from sending for a relative or friend who is not of the foregoing excluded classes: *Provided,* That nothing in this act shall exclude persons convicted of an offence purely political, not involving moral turpitude: *And provided further,* That skilled labor may be imported, if labor of like kind unemployed cannot be found in this country: *And provided further,* That the provisions of this law applicable to contract labor shall not be held to exclude professional actors, artists, lecturers, singers, ministers of any religious denomination, professors for colleges or seminaries, persons

belonging to any recognized learned profession, or persons employed strictly as personal or domestic servants."

"Sec. 38. That no person who disbelieves in or who is opposed to all organized government, or who is a member of or affiliated with any organization entertaining and teaching such disbelief in or opposition to all organized government, or who advocates or teaches the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the Government of the United States or of any other organized government, because of his or their official character, shall be permitted to enter the United States or any Territory or place subject to the jurisdiction thereof. This section shall be enforced by the Secretary of the Treasury under such rules and regulations as he shall prescribe.

"That any person who knowingly aids or assists any such person to enter the United States or any Territory or place subject to the jurisdiction thereof, or who connives or conspires with any person or persons to allow, procure, or permit any such person to enter therein, except pursuant to such rules and regulations made by the Secretary of the Treasury, shall be fined not more than five thousand dollars, or imprisoned for not less than one nor more than five years, or both."

By the act of February 14, 1903, 32 Stat. 825, c. 552, "To establish the Department of Commerce and Labor," the jurisdiction, supervision and control possessed and exercised by the Department of the Treasury over the immigration of aliens into the United States were transferred to the Department of Commerce and Labor established by the act, to take effect and be in force the first day of July, 1903.

*Mr. Clarence S. Darrow* and *Mr. Edgar L. Masters* for appellants:

The arrest and deportation are null and void. The act of February 14, 1903, which created the Department of Commerce and Labor which invested the Secretary thereof with

control of the general immigration service, was repealed by the act of March 3, 1903, which invested the Secretary of the Treasury with the administration of the immigration service, and which repealed by express terms all acts or parts of acts inconsistent therewith.

Section 38 of this act, under which section the appellant was deported, is unconstitutional because in contravention of the First Amendment to the Constitution of the United States, which declares that Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press. The inhibition of the First Amendment goes to the very competency of Congress itself to pass any such law, independent of whether such law relates to a citizen or an alien. *Pollock* v. *F. L. & T. Co.*, 157 U. S. 427; *Downes* v. *Bidwell*, 182 U. S. 244.

Although the law in question discriminates against disbelief this is the same thing as abridging freedom of speech. Spencer's Principles of Ethics, vol. 2, 136; Mill's Essay on Liberty; Freund on Police Power, 475.

The act is unconstitutional and void because in contravention of § 1, Art. III, which declares that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish.

The law provides for the trial of an alien by a Board of Special Inquiry, secret and apart from the public; without indictment; without confrontation of witnesses; without the privilege to the accused of obtaining witnesses; without the right of counsel. It transfers to the Federal inspectors engaged in executing the orders of the executive department of the government, that judicial power which belongs only to the judiciary under the Constitution of the United States.

The framers of the Constitution designed that the departments of the government should not encroach one upon the other. Brice's American Commonwealth, vol. 1, 282; Ban-

croft's History of the Constitution, vol. 1, 327; Madison's Debates, pp. 64, 73, 160; The Federalist, No. 46. For the advantage of thus dividing the government, see Montesquieu's Spirit of Laws, book 2, sec. 6; Locke on Civil Government, p. 14.

The whole judicial power under the Constitution is vested in one Supreme Court and such inferior courts as Congress shall from time to time ordain and establish. *Kilbourn* v. *Thompson,* 103 U. S. 168; *Marbury* v. *Madison,* 1 Cranch, 173; *Martin* v. *Hunter's Lessee,* 1 Wheat. 330; Kent's Com. vol. 1, 301; *Anderson* v. *Hovey,* 124 U. S. 694; *Ex parte Milligan,* 4 Wall. 2.

As to the general principle of liberty and as to its breach by the process warranted by this law, see Kentucky Resolutions; The Philosophy of Law, Immanuel Kant; Spencer's Principles of Ethics, vol. 2, p. 92 (D. Appleton & Co.).

The appellant was deprived of his liberty without due process of law. *Ex parte Sing* (C. C.), 82 Fed. Rep. 22; *Wong Wing* v. *United States,* 163 U. S. 227; *Yick Wo* v. *Hopkins,* 118 U. S. 356; Kent's Com. vol. 1, 599; *Caldwell* v. *Texas,* 137 U. S. 691; *Callan* v. *Wilson,* 127 U. S. 540; Madison's Virginia Resolutions; Elliott's Debates, vol. 4, 555 *et seq.*

No power whatever is delegated by the Constitution to the general government over alien friends with reference to their admission into the United States, or otherwise; or over the beliefs of citizens, denizens, sojourners or aliens, or over the freedom of speech, or of the press. See Elliott's Debates, vol. 1, p. 322, *et seq.*

The decisions which validate the exclusion laws of the general government predicate their reasoning upon the commerce clause of the Constitution or upon the sovereign character of the general government. *Edye* v. *Robertson,* 112 U. S. 580; *Fong Yue Ting* v. *United States,* 146 U. S. 698.

These cases referred to *Gibbons* v. *Ogden,* 9 Wheat. 1, for the definition of commerce. It is contended that *Gibbons* v. *Ogden* is binding in so far only as it holds commerce to include

navigation; that the definition of commerce given in that decision is not binding law, except in so far as it holds commerce to include navigation. The rule of *stare decisis* only arises in respect of decisions directly upon the points at issue. *Cohens* v. *Virginia,* 6 Wheat. 398; *Carroll* v. *Carroll,* 16 How. 275 ; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 427. ·

The regulation of commerce does not include the regulation of beliefs or the regulation of immigration. And though Congress has power to regulate commerce with foreign nations it cannot do so to the extent of overriding inhibitions upon its power which go to its very competency to pass the law. And though Congress may regulate commerce with foreign nations it cannot in and by such regulation abridge the freedom of speech or of the press.

So far as the sovereign character of the government is concerned, sovereignty under our system devolved upon the States after the Revolution. *Chisholm* v. *Georgia,* 2 Dallas, 470; *Sturgis* v. *Crowninshield,* 4 Wheat. 193 ; *Dartmouth College* v. *Woodward,* 4 Wheat. 161 ; *Rhode Island* v. *Massachusetts,* 12 Peters, 720 ; *Martin* v. *Waddell,* 16 Peters, 410 ; *Martin* v. *Hunter's Lessee,* 1 Wheat. 325 ; *Fontain* v. *Ravenel,* 17 How. 369.

The government of the United States is a government of limited power, and has only such powers as have been conferred upon it. Complete sovereignty never was transferred to the general government. *Marbury* v. *Madison,* 1 Cranch, 176 ; *McCulloch* v. *Maryland,* 4 Wheat. 405 ; *Wyman* v. *Southard,* 10 Wheat. 43 ; *Gilman* v. *Philadelphia,* 70 U. S. 713; *Pacific Ins. Co.* v. *Soule,* 7 Wall. 342; *Buffington* v. *Day,* 11 Wall. 113; *United States* v. *Cruickshank,* 92 U. S. 542; *United States* v. *Harris,* 106 U. S. 629; *Yick Wo* v. *Hopkins,* 118 U. S. 356; Story on the Constitution; *Robertson* v. *Baldwin,* 165 U. S. 296, dissent of Mr. Justice Harlan; Cooley's Constitutional Limitations; Tucker's Blackstone App. A.; *Bank* v. *Earle,* 13 Pet. 58; Elliot's Debates, vol. 2, 131; Stephens's Constitutional View of the War, vol. 1, pp. 40, 41, 487, 488, 489.

If aliens can be excluded from the territory of the United

States because of ·their beliefs and that under the commerce clause of the Constitution, then citizens of one State can be prevented, because of their beliefs, from passing from that State to any of the other States, under the commerce clause of the Constitution; because that clause empowers Congress to regulate commerce not only with foreign nations but among the several States.

*Mr. Assistant Attorney General McReynolds* for appellee.

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

This appeal was taken directly to · this court on the· ground that the case · involved the construction or application of the Constitution of the United States, and that the constitutionality of ·a law of the United States was ·drawn in question ; and although it may be, as .argued by the Government, that the principles which must control our decision have been practically settled, we think, the whole record ·considered, that we are not constrained to dismiss the appeal for that reason.

It is contended that the act of March .3,·1903, is. unconstitutional because in contravention of the· First, Fifth and Sixth Articles of Amendment of .the Constitution, and of sec-· tion 1 of Article III of that instrument; and because no power "is delegated by the Constitution to the General Government over alien friends with reference to ·their admission ·into the United States or otherwise, or over the beliefs of citizens, denizens, ·sojourners or aliens, .or over the· freedom of speech or of the press."

Repeated decisions of this court have determined that Con-· gress has· the power to exclude aliens from the United States; to prescribe· the terms and conditions on·which they may come in; to establish regulations for sending out of the country such aliens as have entered in violation of law, and to· commit the enforcement of such conditions and regulations to executive

officers; that the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law, and that the provisions of the Constitution securing the right of trial by jury have no application. *Chae Chan Ping* v. *United States*, 130 U. S. 581; *Nishimura Ekiu* v. *United States*, 142 U. S. 651 ; *Fong Yue Ting* v. *United States*, 149 U. S. 698 ; *Lem Moon Sing* v. *United States*, 158 U. S. 538; *Wong Wing* v. *United States*, 163 U. S. 228; *Fok Yung Yo* v. *United States*, 185 U. S. 296; *Japanese Immigrant Case*, 189 U. S. 86; *Chin Bak Kan* v. *United States*, 186 U. S. 193; *United States* v. *Sing Tuck*, 194 U. S. 161.

In the case last cited the distinction on which *Gonzales* v. *Williams*, 192 U. S. 1, turned was pointed out. The question whether a citizen of Porto Rico, under the treaty of cession and the act of April 12, 1900, came within the immigration law of March 3, 1891, was purely a question of law, which being decided in the negative all questions of fact became immaterial.

In the present case alienage was conceded and was not in dispute, and it was the question of fact thereupon arising that was passed on by the Board, and by the Secretary on appeal.

Whether rested on the accepted principle of international law that every sovereign nation has the power, as inherent in sovereignty and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe; or on the power to regulate commerce with foreign nations, which includes the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States, the act before us is not open to constitutional objection. And while we held in *Wong Wing* v. *United States, supra,* a certain provision of an immigration law invalid on that ground, this act does not come within the ruling. In that case Mr. Justice Shiras, speaking for the court, said:

"We regard it as settled by our previous decisions that the

United States can, as a matter of public policy, by Congressional enactment, forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from their territory, and can, in order to make effectual such decree of exclusion or expulsion, devolve the power and duty of identifying and arresting the persons included in such decree, and causing their deportation, upon executive or subordinate officials.

" But when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused. No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land and unlawfully remain therein. But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial. It is not consistent with the theory of our government that the legislature should, after having defined an offence as an infamous crime, find the fact of guilt and adjudge the punishment by one of its own agents.''

Detention or temporary confinement as part of the means necessary to give effect to the exclusion or expulsion was held valid, but so much of the act of 1892 as provided for imprisonment at hard labor without a judicial trial was held to be unconstitutional. The cases of *Chae Chan Ping, Fong Yue Ting* and *Lem Moon Sing* were carefully considered and applied.

We do not feel called upon to reconsider these decisions, and they dispose of the specific contentions as to the application of the Fifth and Sixth Amendments, and section 1 of Article III, and the denial of the delegation to the General Government of

the power to enact this law.   But it is said that the act vio-
lates the First Amendment, which prohibits the passage of any
law " respecting an establishment of religion, or prohibiting the
free exercise thereof; or abridging the freedom of speech, or
of the press; or the right of the people peaceably to assemble,
and to petition the government for a redress of grievances."

We are at a loss to understand in what way the act is obnox-
ious to this objection.   It has no reference to an establishment
of religion nor does it prohibit the free exercise thereof ; nor
abridge the freedom of speech or the press ; nor the right of
the people to assemble and petition the government for a redress
of grievances.   It is, of course, true that if an alien is not per-
mitted to enter this country, or, having entered contrary to law,
is expelled, he is in fact cut off from worshipping or speaking or
publishing or petitioning in the country, but that is merely be-
cause of his exclusion therefrom.   He does not become one of
the people to whom these things are secured by our Constitu-
tion by an attempt to enter forbidden by law.   To appeal to
the Constitution is to concede that this is a land governed by
that supreme law, and as under it the power to exclude has
been determined to exist, those who are excluded cannot assert
the rights in general obtaining in a land to which they do not
belong as citizens or otherwise.

Appellant's contention really comes to this, that the act is
unconstitutional so far as it provides for the exclusion of an
alien because he is an anarchist.

. The argument seems to be that, conceding that Congress has
the power to shut out any alien, the power nevertheless does
not extend to some aliens, and that if the act includes all alien
anarchists, it is unconstitutional, because some anarchists are
merely political philosophers, whose teachings are beneficial
rather than otherwise.

: Counsel give these definitions from the Century Dictionary:

" ANARCHY.  Absence or insufficiency of government; a state
of society in which there is no capable supreme power, and in
which the several functions of the state are performed badly or

not at all; social and political confusion. Specifically—2. A social theory which regards the union of order with the absence of all direct government of man by man as the political ideal; absolute individual liberty. 3. Confusion in general.

"ANARCHIST. 1. Properly, one who advocates anarchy or the absence of government as a political ideal; a believer in an anarchic theory of society; especially, an adherent of the social theory of Proudhon. (See Anarchy, 2.) 2. In popular use, one who seeks to overturn by violence all constituted forms and institutions of society and government, all law and order, and all rights of property, with no purpose of establishing any other system of order in the place of that destroyed; especially, such a person when actuated by mere lust of plunder. 3. Any person who promotes disorder or excites revolt against an established rule, law, or custom."

And Huxley is quoted as saying: "Anarchy, as a term of political philosophy, must be taken only in its proper sense, which has nothing to do with disorder or with crime, but denotes a state of society in which the rule of each individual by himself is the only government the legitimacy of which is recognized."

The language of the act is "anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States or of all government or of all forms of law, or the assassination of public officials." If this should be construed as defining the word "anarchists" by the words which follow, or as used in the popular sense above given, it would seem that when an alien arrives in this country, who avows himself to be an anarchist, without more, he accepts the definition. And we suppose counsel does not deny that this Government has the power to exclude an alien who believes in or advocates the overthrow of the Government or of all governments by force or the assassination of officials. To put that question is to answer it.

And if the judgment of the board and the Secretary was that Turner came within the act as thus construed, we can-

not hold as matter of law that there was no evidence on which that conclusion could be rested. Even if Turner, though he did not so state to the board, only regarded the absence of government as a political ideal, yet when he sought to attain it by advocating, not simply for the benefit of workingmen, who are justly entitled to repel the charge of desiring the destruction of law and order, but "at any rate, as an anarchist," the universal strike to which he referred, and by discourses on what he called "The legal murder of 1887," *Spies* v. *People*, 122 Illinois, 1, and by addressing mass meetings on that subject in association with Most, *Reg.* v. *Most*, 7 Q. B. Div. 244; *People* v. *Most*, 171 N. Y. 423, we cannot say that the inference was unjustifiable either that he contemplated the ultimate realization of his ideal by the use of force, or that his speeches were incitements to that end.

If the word "anarchists" should be interpreted as including aliens whose anarchistic views are professed as those of political philosophers innocent of evil intent, it would follow that Congress was of opinion that the tendency of the general exploitation of such views is so dangerous to the public weal that aliens who hold and advocate them would be undesirable additions to our population, whether permanently or temporarily, whether many or few, and, in the light of previous decisions, the act, even in this aspect, would not be unconstitutional, or as applicable to any alien who is opposed to all organized government.

We are not to be understood as depreciating the vital importance of freedom of speech and of the press, or as suggesting limitations on the spirit of liberty, in itself unconquerable, but this case does not involve those considerations. The flaming brand which guards the realm where no human government is needed still bars the entrance; and as long as human governments endure they cannot be denied the power of self-preservation, as that question is presented here.

Reference was made by counsel to the alien law of June 25, 1798, 1 Stat. 570; c. 58, but we do not think that the con-

troversy over that law (and the sedition law) and the opinions expressed at the time against its constitutionality have any bearing upon this case, which involves an act couched in entirely different terms and embracing an entirely different purpose. As Mr. Justice Field remarked in the *Chinese Exclusion Case*, 130 U. S. 581, 610: "The act was passed during a period of great political excitement, and it was attacked and defended with great zeal and ability. It is enough, however, to say that it is entirely different from the act before us, and the validity of its provisions was never brought to the test of judicial decision in the courts of the United States."

*Order affirmed.*

MR. JUSTICE BREWER, concurring.

In view of the range of discussion in the argument of this case at the bar I feel justified in adding a few words to what has been said by the Chief Justice.

First. I fully endorse and accentuate the conclusions of the court, as disclosed by the opinion, that, notwithstanding the legislation of Congress, the courts may and must, when properly called upon by petition in *habeas corpus*, examine and determine the right of any individual restrained of his personal liberty to be discharged from such restraint. I do not believe it within the power of Congress to give to ministerial officers a final adjudication of the right to liberty or to oust the courts from the duty of inquiry respecting both law and facts. "The privilege of the writ of *habeas corpus* shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." Const. Art. 1, sec. 9, clause 2.

Second. While undoubtedly the United States as a nation has all the powers which inhere in any nation, Congress is not authorized in all things to act for the nation, and too little effect has been given to the Tenth Article of the amendments to the Constitution, that " the powers not delegated to the United States by the Constitution, nor prohibited by it to the

States, are reserved to the States respectively, or to the people." The powers the people have given to the General Government are named in the Constitution, and all not there named, either expressly or by implication, are reserved to the people and can. be exercised only by them, or upon further grant from them.

Third. No testimony was offered on the hearing before the Circuit Court other than that taken before the immigration board of inquiry, and none before such board save that preserved in its report. Hence the facts must be determined by that evidence. It is not an unreasonable deduction therefrom that petitioner is an anarchist in the commonly accepted sense of the term, one who urges and seeks the overthrow by force of all government. If that be not the fact, he should have introduced testimony to establish the contrary. It is unnecessary, therefore, to consider what rights he would have if he were only what is called by way of differentiation a philosophical anarchist, one who simply entertains and expresses the opinion that all government is a mistake, and that society would be better off without any.