STRATTON, Collector of Customs, v. OCEANIC STEAMSHIP CO.

(Circuit Court of Appeals, Ninth Circuit.   October 2, 1905.)

No. 1,181.

ALIENS—STATUTE IMPOSING HEAD TAX—VALIDITY OF DEPARTMENT REGULATIONS.
Act March 3, 1903, c. 1012, § 1, 32 Stat. 1213 [U. S. Comp. St. Supp. 1905, p. 274], which imposes a head tax on alien passengers entering the United States, to be paid by the master or owner of the vessel, provides that such tax "shall not be levied upon aliens in transit through the United States." It also (section 22) authorizes the commissioner general of immigration, under the direction of the Secretary of the Treasury, to establish "such rules and regulations, * * * not inconsistent with law, as he shall deem best calculated for carrying out the provisions of·this act and for protecting the United States and aliens migrating thereto from fraud and loss."   *Held*, that a regulation requiring the master or owner of a vessel bringing an alien to a port of the United States, for the professed purpose of proceeding directly therefrom to foreign territory, to deposit the amount of the head tax with the collector before such alien shall be premitted to land, the same to be refunded on proof satisfactory to the immigration officer in charge of said port that such alien has passed by direct and continuous journey through and out of the United States, was not an amendment or addition to the statute, but was a reasonable and lawful regulatiou for the purpose of protecting the United States from fraud and loss, and within the power conferred on the commissioner.

Gilbert, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of California.

The question involved in this case is one of law.   The facts were stipulated and agreed upon substantially as follows: The defendant in error brought from foreign ports 210 alien passengers, who were then and there in transit through the United States and bound for foreign ports.   Before permitting said passengers to land, the plaintiff in error demanded that the steamship company deposit two dollars for each and every passenger so transported, to be refunded upon proof satisfactory to the immigration officer in charge at the port of San Francisco that said aliens had passed by direct and continuous journey through and out of the United States, and refused to permit said passengers to land except on deposit being made.   Thereupon the defendant in error duly protested against said action as being illegal, and because of the said refusal to permit the landing of said aliens from said vessels, and because of the injury to said defendant in error consequent thereon, the latter deposited with the collector the tax of two dollars for each of said aliens, and then and there notified the collector that it would sue to recover the same back.   The collector then and there agreed that such deposit should in no wise or in any manner vitiate, prevent, or prejudice any action at law, or any right of a judicial character, which the said defendant in error might see proper to commence.   Said collector received said money subject to said protest, understanding, and agreement.   The defendant in error did not give proof satisfactory to the immigration officers in charge at the port of San Francisco that said aliens, or any of them, had passed by direct and continuous journey through and out ·of the United States, as required by the provisions of rule 15 of the regulations respecting immigration. Demand was made for repayment, but refused, and no part has been repaid. This action was brought to recover the amount of money paid under protest.

Section 1 of the act of March 3, 1903, "to regulate the immigration of aliens into the United' States," provides: "That there shall be levied, collected and paid a duty of two dollars for each and every passenger not a citizen of the United States, or of the Dominion of Canada, the Republic of Cuba, or of the Republic of Mexico, who shall come by steam, sail, or other vessel from any foreign port to any port within the United States, or by railway or any

other mode of transportation, from foreign contiguous territory to the United States. The said duty shall be paid to the collector of customs of the port or customs district to which said alien passenger shall come. * * * The duty imposed by this section shall be a lien upon the vessel which shall bring such aliens to ports of the United States, and shall be a debt in favor of the United States against the owner or owners of such vessels, and the payment of such duty may be enforced by any legal or equitable remedy. The head tax herein provided for shall not be levied upon aliens in transit through the United States," etc. Section 22 of said act provides: "That the commissioner general of immigration, in addition to such other duties as may by law be assigned to him, shall, under the direction of the Secretary of the Treasury, have charge of the administration of all laws relating to the immigration of aliens into the United States. * * * He shall establish such rules and regulations, prescribe such forms of bonds, reports, entries, and other papers, and shall issue from time to time such instructions, not inconsistent with law, as he shall deem best calculated for carrying out the provisions of this act and for protecting the United States and aliens migrating thereto from fraud and loss," etc. Act March 3, 1903, c. 1012, §§ 1, 22, 32 Stat. 1213, 1219 [U. S. Comp. St. Supp. 1905, pp. 274, 285.]

Under the provisions of the statute the commissioner on August 26. 1903, adopted the following regulation: "Rule 15. No alien desiring admission at a port of the United States for the professed purpose of proceeding directly therefrom to foreign territory shall be permitted to land thereat except after deposit with the collector of customs at said port by the master or owner of the vessel on which such alien is brought of the amount of the head tax ($2) prescribed by section 1 of the act approved March 3, 1903, said amount to be refunded upon proof satisfactory to the immigration officer in charge at the port of arrival that said alien has passed by direct and continuous journey through and out of the United States."

The court rendered judgment in favor of the steamship company for the amount of money it had paid to the collector under protest.

Robt. T. Devlin, U. S. Atty., and Benjamin L. McKinley, Asst. U. S. Atty. (Edward E. Cushman, Sp. Asst. Atty. Gen., of counsel), for plaintiff in error.

Nathan H. Frank and Walter D. Mansfield, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after making the foregoing statement). Is rule 15, quoted in the statement of facts, valid? This is the only question involved herein. If valid and reasonable, the judgment should be reversed. If it is inconsistent with the law of March 3, 1903, and was adopted without authority of law, the judgment should be affirmed.

The law is well settled that the legislative power of the United States is vested in Congress, and that Congress has no authority to delegate that power to any administrative officer; but Congress has the power to authorize any of its administrative officers to make such rules and regulations as may be deemed necessary to enforce the provisions of the law. The true distinction in all such cases is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the second, no valid objection can be made. Dastervignes v. United States, 122 Fed. 30, 33, 58 C. C. A. 346, et seq., and authorities there cited. From this general rule it is apparent that the commissioner general of immigration could not, by any regulation

which he might adopt, alter or amend the law. All that he could do would be to regulate the mode of proceeding to carry into effect the act of Congress, and adopt such rules, not inconsistent with the law, as were deemed necessary to carry out the provisions of the statute in such a manner "as he shall deem best calculated for carrying out the provisions of this act and for protecting the United States and aliens migrating thereto from fraud or loss." This authority given by Congress to the commissioner necessarily invested him with a broad and wide discretion, unlimited in fact, save that it must not be "inconsistent" with the law, and should not be unreasonable in its terms and conditions.

The border line of his power and authority is clearly defined; but the question, under the state of facts here presented, as to whether or not he kept within the bounds of his power, or exceeded it, is by no means as easy of solution. Does the rule alter or amend the law under which the commissioner acted? If so, in what respect? It is true that the law expressly provides that:

"The head tax herein provided for shall not be levied upon aliens in transit through the United States."

But the rule does not say that it shall be levied before the immigrant is allowed to land. It does, however, require that a deposit must be made with the collector of the port of the amount of the head tax, and that this amount shall be refunded upon proof being made satisfactory to the immigration officer in charge that said alien has passed by direct and continuous journey through and out of the United States. The deposit of the money, as required by the rule, is simply one of the means adopted by the commissioner to prevent an evasion of the law. The possession of a ticket through the United States by a passenger on board of a vessel landing from any foreign port would be, at best, but prima facie evidence that the passenger in good faith intended to go through the United States, and not to remain in this country. If any alien passenger on board the vessel of the defendant in error concluded to dispose of his through ticket, or for any other reason chose to remain in the United States, the government would be liable to lose the head tax. It would, or at least might be, a loss to the government. Such conduct upon the part of an alien passenger would certainly be a fraud upon the government.

Can it, therefore, be legally said that a regulation intended to prevent such fraud and imposition upon the part of the passenger in any manner altered or changed the law? How can a steamship company, which is responsible under the law for the payment of the head tax from every alien immigrant coming into the United States, complain of this rule? It has the power and means to protect itself from loss. It likewise has the power and means to furnish satisfactory proof to the immigration officer that the passenger aliens on its vessels have passed by direct and continuous journey through and out of the United States. The law holds the steamship company responsible for the payment of the head tax upon immigrants. Who can say that this regulation is not "best calculated for carrying out the provisions of this act"? What other rule could be adopted that would prove as efficient for the purpose of protecting the United States from fraud or loss? No means were desig-

nated in the act to prevent the loss or fraud mentioned in the statute. This was left to the discretion of the commissioner. The commissioner, under this authority, could not adopt any rules or regulations which, in their nature or character, would, if carried out, "defeat totally the right which Congress had granted." Campbell v. United States, 107 U. S. 407, 410, 2 Sup. Ct. 759, 762, 27 L. Ed. 592. But the rule adopted does not, in our opinion, defeat the right. It only requires that aliens in transit through the United States shall make "proof satisfactory to the immigration officer" that they were of a class exempted by the law. They were not entitled to the exemption from the head tax under the law, unless they passed through the country. If they are not required to make satisfactory proof upon this point, then there is no protection to the government whatever. Every immigrant would have the right to land without paying the head tax, if he simply represented to the commissioner that it was his intention and purpose to pass through the United States.

The theory upon which this action was brought and maintained is that the immigration commissioner had no power or authority to demand any proof whatever that the aliens had passed through the country. In this case there is no proof of any kind that the alien passengers for whom the steamship company made the deposit ever left the city of San Francisco after their arrival. For aught that appears in the record all of said passengers may still be in San Francisco, or may have located in different parts of the country, and never have passed through or out of the United States. Counsel for the steamship company on the hearing said:

"It is stipulated between the parties now that the passengers in question, 210 in number, as alleged in the answer, were transit passengers—that is, bound on their way through the United States to a foreign port; that they made the deposit in question, but that the owners, the Oceanic Steamship Company, did not supply proof satisfactory to the immigration officer in charge of the port of arrival that said passengers had passed by direct and continuous journey through and out of the United States."

It was further admitted:

"That none of these persons were citizens of the United States, or of the Dominion of Canada, or of the Republic of Cuba, or of the Republic of Mexico. * * * Mr. Frank: I will stipulate that they were transit passengers, that they came here with through tickets from Sydney to London and various points in Europe, and that they came here intending to go through the United States, and that was the manner in which they left the vessel. The Court: And do you not propose to prove that they left the United States? Mr. Frank: No. I do not. The Court: You have not furnished such proof to the collector, and you do not propose to furnish it here now? Mr. Frank: We have furnished proof that should be satisfactory. The only question is the validity of the statute."

It will thus be seen that this action is brought to test the validity of rule 15, and to establish the right of the steamship companies to land such passengers without any proof whatever as to the aliens being exempt from the payment of the head tax, other than the tickets which they had in their possession. We have conceded that the commissioner could not alter the law, could not amend the statute, or ingraft rules that intrench upon the passengers' right to go through the country without being subject to the payment of the tax. We have sought to

show that their rights in this respect are not infringed upon in any manner; that the law is not changed; that, if the law applies to this class of aliens, the rule adopted was well calculated to save the government from fraud or loss. We are not prepared to say that this class of aliens is not subject to any rule or regulation of the commissioner, or that he acted in violation of the law by including them within the rules and regulations.

The case of Fok Yung Yo v. United States, 185 U. S. 296, 22 Sup. Ct. 686, 46 L. Ed. 917, although different in several particulars, bears close analogy in the principles announced to the points involved herein. Fok Yung Yo applied to the District Court for a writ of habeas corpus, claiming that the collector of customs had no authority to examine or confine him. The admitted facts were:

"The petitioner is a subject of the Empire of China. He arrived at the port of San Francisco on the Japanese steamship Nippon Maru, the manifest of which vessel states that he intended to go to San Jose de Guatemala. Petitioner herein also alleges that that was his intended destination. The collector of customs at the port of San Francisco did, on September 23, 1901, deny the petitioner the privilege of further pursuing his journey to his alleged point of destination. The petitioner has a ticket, or an order for a ticket, for a through passage from Hong Kong, China, to San Jose de Guatemala by steamer."

The court in its opinion recites the acts of Congress, the treaty with China, and the various rules and regulations adopted at different times by the Secretary of the Treasury. The one there under consideration, having been adopted in 1900, reads as follows:

"Complaints having reached the department of attempted violations of the laws enacted for the exclusion of Chinese by those who have been allowed to pass through the United States to foreign territory, the following rules are hereby adopted for your guidance in granting permission for such transit: Any Chinese person arriving at your port, claiming to be destined to some foreign country, and seeking permission to pass through the United States, or any portion thereof, to reach such alleged foreign destination, shall be granted permission for such transit only upon complying with the following conditions: (1) The applicant shall be required to produce to the collector of customs at the first port of arrival a through ticket across the whole territory of the United States (and to his or her alleged foreign destination according to the steamship manifest) intended to be traversed, and such other proof as he (or she) may be able to adduce, to satisfy the said collector that a bona fide transit only is intended. * * * (2) The applicant in each case, or some responsible person on his (or her) behalf, or the transportation company whose through ticket he (or she) holds, shall furnish to the said collector of customs a bond in a penal sum of not less than $500, conditioned for applicant's continuous transit through, and actual departure from, the United States within a reasonable time, not exceeding twenty days from the date of arrival at said port."

The court, in discussing these rules, after quoting from 1 Kent, 35, that "the entry of foreigners and their effects is not an absolute right, but only one of imperfect obligation, and it is subject to the discretion of the government which tolerates it," said:

"In short, the privilege of transit, although it is one that should not be withheld without good cause, is nevertheless conceded only on such terms as the particular government prescribes in view of the well-being of its own people. If, then, these regulations have the force of law, they bind the courts. * * * Necessarily the collector's decision could not be controlled by the bare production of a through ticket to a point in foreign territory. The very question to be determined is good faith in the transit, and good faith would be lacking if

that transit were merely a means of effecting admission into the United States."

In the course of the opinion, upon another point, the court said:

"Nor is the provision open to the ingenious construction suggested, that it is only after transit has commenced that the privilege may be abused. The abuse of the privilege might consist in the use of passage across the country to reach a point from which to effect an entrance into it, contrary to law. The journey contemplated would in effect be continuous, and the intermediate destination could not absolve from the guilt involved in the effort to attain that forbidden ulterior destination. Such an abuse of the privilege could only be prevented by arresting the journey on the threshold."

So here, if the collector of the port had the power to require, under the rules and regulations adopted by the commissioner, security for the good faith of the immigrants, he had the right, at the threshold of the journey, to demand it. There was no attempt by the commissioner to change the status of the alien passengers. Herein it differs from the cases cited by appellee. In Merritt v. Welsh, 104 U. S. 694, 26 L. Ed. 896, the quality of the sugar subject to custom duty was specifically described in the statute. The administrative officers sought by their rules and regulations to change the test prescribed by the statute. This they could not do. If in the present case the law had provided that the production of through tickets by the alien passengers to the collector of the port should be competent proof of their right to exemption from the tax, no other proof could be required.

Nor is this case governed by that of Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267, where the law provided that live animals specially imported for breeding purposes from beyond the seas should be admitted free of duty, and the administrative officer adopted a rule that such animals should be of superior stock, and this was held to be an attempt to alter and amend the law. But would not the administrative officer in that case have had the power, under the authority given him by the law, to make rules and regulations to require proof that the live animals in that case were in fact "imported for breeding purposes"? This is, in fact, the true distinction between the cases.

Some suggestion has been made to the effect that, if the commissioner had any power or authority in the premises, he abused his discretion and acted unreasonably in providing that the proofs should show that the alien immigrant "has passed by direct and continuous journey through the United States." The language used should be given a reasonable and sensible construction. It would be unreasonable and absurd to presume that the commissioner could select the line of one railroad as against another, on the ground that the one selected is "a more direct route" than the other, or that by using the word "continuous" the passenger could not stop overnight on his journey. These questions are not before us for decision. It does not appear that the passengers in question ever started on their journey.

Our conclusion is that the court erred in rendering judgment for the steamship company.

The judgment of the Circuit Court is reversed.

GILBERT, Circuit Judge (dissenting). The statute which imposes a tax on passengers not citizens of the United States arriving on vessels coming from a foreign country to a port within the United States contains the express provision that:

"The head tax herein provided for shall not be levied upon aliens in transit through the United States."

The act further provides that the commissioner general of immigration shall establish such rules not inconsistent with the law as he shall deem best calculated for carrying out the provisions of the act, "and for protecting the United States and aliens migrating thereto from fraud and loss." This provision for the protection of aliens evidently refers to aliens in transit through the United States, for other aliens can need no protection. The commissioner general of immigration has seen fit to protect the United States and the aliens migrating thereto from fraud and loss by requiring the payment of the head tax by every alien who arrives at a port of the United States in transit therethrough, and by leaving him the doubtful remedy of obtaining repayment thereof upon proof satisfactory to the immigration officer in charge at the port of arrival that he has passed through and out of the United States by a direct and continuous journey. In other words, the plain intendment of the statute is violated in the first instance by levying the tax upon aliens who, the law says, shall be exempt from the tax; but it is said that the law is not violated, for the reason that provision is made for refunding the tax so levied. Just what kind of proof shall be required of such aliens in order to recover the money paid is not specified in the rules and regulations.

The district attorney in his brief suggests that by use of a photograph, a description in duplicate, and an affidavit before a United States consul at the foreign port or place to which the immigrant is going, the honesty of his past purpose and representation may become a demonstrated fact. But it is too plain to require discussion that such a regulation would impose a burden which no traveler through the United States is going to assume. The expense of the proofs, photograph, description, and affidavit would certainly exceed the amount of the head tax, to say nothing of the time and trouble involved in obtaining them. If the possession of through tickets to European ports by way of the United States is not sufficient to convince the collector of the port of San Francisco that the holders thereof are in transit through the United States, it is not perceivable how any scheme can be devised by which they can thereafter prove to his satisfaction that they did in fact carry out their professed purpose, without incurring a burden of expense and trouble so great as to effectually deter them from undertaking it. It is true that in the case of Fok Yung Yo v. United States, 185 U. S. 296, 22 Sup. Ct. 686, 46 L. Ed. 917, the court sustained the action of the commissioner of immigration in requiring a bond of a Chinese laborer in transit through the United States; but the authority to impose that burden was found in the express terms of the treaty of December 8, 1894, by which it was stipulated that Chinese laborers in the course of their journey to or from other countries should be subject to such regulations by the government of the United States as might be necessary to prevent said privilege of transit

from being abused. Here there is no such treaty regulation. There is nothing but the plain statutory provision that no head tax shall be imposed upon alien passengers in transit.

The effect of the regulation of the commissioner of immigration is clearly to impose such a head tax, and for that reason I think the judgment of the Circuit Court should be affirmed.