INLAND STEEL CO. v. NATIONAL LA-
BOR RELATIONS BOARD.

UNITED STEEL WORKERS OF AMERI-
CA, C.I.O., et al. v. NATIONAL LABOR
RELATIONS BOARD.

Nos. 9612, 9634.

United States Court of Appeals
Seventh Circuit.

Sept. 23, 1948.

Writ of Certiorari Granted Jan. 17, 1949.
See 69 S.Ct. 480.

248

MAJOR, Circuit Judge, dissenting in part.

———◆———

Ernest S. Ballard and Merrill Shepard, both of Chicago, Ill. (Pope & Ballard, of Chicago, Ill., of counsel), for Inland Steel Co., for petitioner.

Arthur J. Goldberg, of Chicago, Ill., and Frank Donner and Martin Kurasch, both of Washington, D.C., for United Steel Workers of America.

David P. Findling, Ruth Weyand, Marcel Mallet-Prevost, and A. Norman Somers, Asst. Gen. Counsels, and Mozart G. Ratner, Atty., National Labor Relations Board, all of Washington, D. C., for respondent.

Edmund Hatfield, of Chicago, Ill., filed a brief as amicus curiae for National Lawyers' Guild.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

MAJOR, Circuit Judge (dissenting in part).

These cases are here upon petition (in No. 9612) of Inland Steel Company (here-inafter called the Company), to review and set aside an order issued by the National Labor Relations Board on April 12, 1948, against the Company, pursuant to Sec. 10(c) of the National Labor Relations Act,[1] following the usual proceedings under Sec. 10 of the Act, and upon petition (in No. 9634) of the United Steel Workers of America, C.I.O. (hereinafter called the Union), to review and set aside a condition attached to the Board's order.

In the beginning, it seems appropriate to set forth that portion of the Board's order which gives rise to the questions here in controversy. The order requires the Company to

"Cease and desist from:

"(a) Refusing to bargain collectively with Local Unions Nos. 1010 and 64, United Steelworkers of America (CIO), with respect to its pension and retirement policies if and when said labor organization shall have complied within thirty (30) days from the date of this Order, with Section 9(f), (g), and (h) of the Act, as amended, as the exclusive bargaining representative of all production, maintenance, and transportation workers in the [petitioner's] Indiana Harbor, Indiana, and Chicago Heights, Illinois, plants, excluding foremen, assistant foremen, supervisory, office and salaried employees, bricklayers, timekeepers, technical engineers, technicians, draftsmen, chemists, watchmen, and nurses;

"(b) Making any unilateral changes, affecting any employees in the unit represented by the Union, with respect to its pension and retirement policies without prior consultation with the Union, when and if the Union shall have complied with the filing requirements of the Act, as amended, in the manner set forth above."

The Company, in case No. 9612, attacks that portion of the order which requires it to bargain with respect to its retirement and pension policies. The Union has been permitted to intervene and joins the Board in the defense of this part of the order.

[1] The National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. (hereinafter referred to as the Act), was amended by the Labor Management Relations Act, 1947, effective August 22, 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. (hereinafter referred to as the amended Act). The unfair labor practices found by the Board herein occurred, in part, prior to the effective date of the amendment and, in part, thereafter.

The Union, in case No. 9634, attacks the condition attached to the order, which requires as a prerequisite to its enforcement that the Union comply with Sec. 9(h) of the Act. Obviously, if the Company's position is sustained, the Union's petition need not be considered. On the other hand, if the Company's contention is denied, we will be confronted with the question raised by the Union.

We shall, therefore, first consider the question presented on the Company's petition for review. In doing so, we do not overlook the Board's contention that we are without authority to consider such question on the ground that the Company is not aggrieved until there has been compliance by the Union with the condition attached to the order. We think this contention is without merit and need not be discussed.

There is no question as to jurisdiction and no dispute of any consequence as to the facts in either case. The Company's refusal to bargain concerning a retirement and pension plan is based solely on its contention that it is not required to do so under the terms of the Act. The Union has refused to comply with the condition attached to the order insofar as Sec. 9(h) is concerned, on the ground that the paragraph is unconstitutional. Thus, a question of law is presented in each case.

The collective bargaining requirement in in the original Act was embraced mainly in Secs. 8(5) and 9(a).[2] No question is raised as to any change in the status of the parties because of the amended Act. It seems, therefore, that the original Act is of importance only as an aid in construing the amended Act wherein Congress employed the identical language, so far as pertinent to the instant question, which it had originally used.

The Company relates in lengthy detail the complicated nature of its retirement and pension plan, for the purpose, as we understand, of showing that it is impossible, or at any rate highly impractical, for it to bargain relative thereto with the multiplicity of bargaining units which the Board has established in its plant. It states in its brief:

"Retirement and pension plans such as the petitioner's cannot be dealt with through the processes of compulsory collective bargaining required by the National Labor Relations Act, which entail bargaining within units of the character established by Section 9(a) and (b) of that Act."

The Company concedes that "Congress could have established a requirement of compulsory collective bargaining upon any subject which a representative of the employees chose to present for that purpose," and we understand from some parts of its argument that it tacitly concedes that some retirement and pension plans may be within the scope of the bargaining requirement. However, we find in the Company's reply brief, in response to the Board's argument, what appears to be the inconsistent statement that "Congress intended to exclude from the compulsory bargaining requirement of the Act all industrial retirement and pension plans. The law is a law for all and it is the same law." We agree, of course, with the last sentence of this quotation. We also are of the view that the bargaining requirements of the Act include all retirement and pension plans or none. Otherwise, as the Board points out, "some employers would have to bargain about pensions and some would not, depending entirely upon the unit structure in the plant and the nature of the pension plan the employer has established or desires to establish." Such a holding as to the Act's requirements would supply the incentive for an employer to devise a plan or system which would be sufficiently comprehensive and difficult to remove it from the ambit of the statute, and success of such an effort would depend upon the ingenuity of the formulator of the plan. We are satisfied no such construction of the Act can reasonably be made.

---

[2] These sections were reenacted in Secs. 8(a) (5) and 9(a) of the amended Act, without material change so far as the present issue is concerned. The Board found that retirement and pension matters were subjects of compulsory collective bargaining under the Act and that they remained so under the amended Act.

It is, therefore, our view that the Company's retirement and pension plan, complicated as it is asserted to be, must be treated and considered the same as any other such plan. It follows that the issue for decision is, as the Board asserts, whether pension and retirement plans are part of the subject matter of compulsory collective bargaining within the meaning of the Act. The contention which we have just discussed has been treated first, and perhaps somewhat out of order, so as to obviate the necessity for a lengthy and detailed statement of the Company's plan.

Briefly, the plan as originally initiated on January 1, 1936, provided for the establishment of a contributory plan for the payment of retirement annuities pursuant to a contract between the Company and the Equitable Life Assurance Society. Only employees with earnings of $250.00 or more per month were eligible to participate. Effective December 31, 1943, the plan was extended to cover all employees regardless of the amount of their earnings, provided they had attained the age of 30 and had five years of service. The plan from the beginning was optional with the employees, who could drop out at any time, with rights upon retirement fixed as of that date. On December 28, 1945, the Company entered into an agreement with the First National Bank of Chicago, wherein the Company established a pension trust, the purpose of which was to augment the Company's pension program by making annuities available to employees whose period of service had occurred largely during years prior to the time when participation in the retirement plan was available to them. These were employees whose retirement date would occur so soon after the establishment of the plan that it would not afford them adequate retirement annuity benefits. The employees eligible to participate in the pension trust were not required to contribute thereto, but such fund was created by the Company's contributions.

An integral and it is asserted an essential part of the plan from the beginning was that employees be compulsorily retired at the age of 65. (There are some exceptions to this requirement which are not material here.)

The Company's plan had been in effect for five and one-half years when, because of the increased demands for production and with a shortage of manpower occasioned by the war, it was compelled to suspend the retirement of its employees as provided by its established program. In consequence there were no retirements for age at either of the plants involved in the instant proceeding from August 26, 1941 to April 1, 1946. This temporary suspension of the compulsory retirement rule was abrogated, and it was determined by the Company that no retirements should be deferred beyond June 30, 1946. By April 1, 1946, all of the Company's employees, some 224 in number, who had reached the age of 65, had been retired. Thereupon, the Union filed with the Company a grievance protesting its action in the automatic retirement of employees at the age of 65. The Company refused to discuss this grievance with the Union, taking the position that it was not required under the Act to do so or to bargain concerning its retirement and pension plan, and particularly concerning the compulsory retirement feature thereof. Whereupon, the instant proceeding was instituted before the Board, with the result already noted.

This brings us to the particular language in controversy. Sec. 8(5) of the Act requires an employer "to bargain collectively with the representative of his employees, subject to the provisions of Sec. 9(a)," and the latter section provides that the duly selected representative of the employees in an appropriate unit shall be their exclusive representative "for the purposes of collective bargaining *in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *.*" (Italics supplied.) The instant controversy has to do with the construction to be given or the meaning to be attached to the italicized words; in fact, the controversy is narrowed to the meaning to be attached to the term "wages" or "other conditions of employment."

The Board found and concluded that the benefits accruing to an employee by rea-

son of a retirement or pension plan are encompassed in both categories. As to the former it stated in its decision:

"With due regard for the aims and purposes of the Act and the evils which it sought to correct, we are convinced and find that the term 'wages' as used in Section 9(a) must be construed to include emoluments of value, like pension and insurance benefits, which may accrue to employees out of their employment relationship. * * * Realistically viewed, this type of wage enhancement or increase, no less than any other, becomes an integral part of the entire wage structure, and the character of the employee representative's interest in it, and the terms of its grant, is no different than in any other case where a change in the wage structure is effected."

The Board also found and concluded that in any event a retirement and pension plan is included in "conditions of employment" and is a matter for collective bargaining. After a careful study of the well written briefs with which we have been favored, we find ourselves in agreement with the Board's conclusion. In fact, we are convinced that the language employed by Congress, considered in connection with the purpose of the Act, so clearly includes a retirement and pension plan as to leave little, if any, room for construction. While, as the Company has demonstrated, a reasonable argument can be made that the benefits flowing from such a plan are not "wages," we think the better and more logical argument is on the other side, and certainly there is, in our opinion, no sound basis for an argument that such a plan is not clearly included in the phrase, "other conditions of employment." The language employed, when viewed in connection with the stated purpose of the Act, leads irresistibly to such a conclusion. And we find nothing in the numerous authorities called to our attention or in the legislative history so strongly relied upon which demonstrates a contrary intent and purpose on the part of Congress.

The opening sentence in the Company's argument is as follows: "Sections 8 (5) and 9(a) of the Act do not refer to industrial retirement and pension plans, such as that of the petitioner, *in haec verba.*" Of course not, and this is equally true as to the myriad matters arising from the employer-employee relationship which are recognized as included in the bargaining requirements of the Act but which are not specifically referred to. Illustrative are the numerous matters concerning which the Company and the Union have bargained and agreed, as embodied in their contract of April 30, 1945. A few of such matters are: a provision agreeing to bargain concerning nondiscriminatory discharges; a provision concerning seniority rights, with its far reaching effect upon promotions and demotions; a provision for the benefit of employees inducted into the military service; a provision determining vacation periods with pay; a provision concerning the safety and health of employees, including clinic facilities; a provision for in-plant feeding, and a provision binding the Company and the Union to bargain, in conformity with a Directive Order of the National War Labor Board concerning dismissal or severance pay for employees displaced as the result of the closing of plants or the reduction in the working force following the termination of the war. None of these matters and many others which could be mentioned are referred to in the Act *"in haec verba,"* yet we think they are recognized generally, and they have been specifically recognized by the Company in the instant case as proper matters for bargaining and, as a result, have been included in a contract with the Union. Some of the benefits thus conferred could properly be designated as "wages," and they are all "conditions of employment." We think no common sense view would permit a distinction to be made as to the benefits inuring to the employees by reason of a retirement and pension plan.

The Company in its brief states the reasons for the establishment of a uniform fixed compulsory retirement age for all of its employees in connection with its retirement annuity program, among which are (1) "The fixed retirement age gives the employee advance notice as to the length of his possible service with the Company and enables him to plan accordingly," (2) "The fixed retirement age prevents griev-

ances that otherwise would multiply as the question of each employee's employability arose," (3) "A fixed retirement age gives an incentive to younger men," and (4) "It is unfair and destructive of employee morale to discriminate between types of jobs or types of employees in retiring such employees from service." These reasons thus stated for a compulsory retirement age demonstrate, so we think, contrary to the Company's contention, that the plan is included in "conditions of employment."

The Supreme Court, in National Licorice Co. v. N. L. R. B., 309 U.S. 350, 360, 60 S.Ct. 569, 84 L.Ed. 799, held that collective bargaining extends to matters involving discharge actions and, as already noted, the Company in its contract with the Union has so recognized. We are unable to differentiate between the conceded right of a Union to bargain concerning a discharge, and particularly a nondiscriminatory discharge, of an employee and its right to bargain concerning the age at which he is compelled to retire. In either case, the employee loses his job at the command of the employer; in either case, the effect upon the "conditions" of the person's employment is that the employment is terminated, and we think, in either case, the affected employee is entitled under the Act to bargain collectively through his duly selected representatives concerning such termination. In one instance, the cessation of employment comes perhaps suddenly and without advance notice or warning, while in the other, his employment ceases as a result of a plan announced in advance by the Company. And it must be remembered that the retirement age in the instant situation is determined by the Company and forced upon the employees without consultation and without any voice as to whether the retirement age is to be 65 or some other age. The Company's position that the age of retirement is not a matter for bargaining leads to the incongruous result that a proper bargaining matter is presented if an employee is suddenly discharged on the day before he reaches the age of 65, but that the next day, when he is subject to compulsory retire-

ment, his Union is without right to bargain concerning such retirement.

The Company, however, attempts to escape the force of this reasoning by arguing that the retirement provision affects tenure of employment as distinguished from a condition of employment. The argument, as we understand, rests on the premise that the Act makes a distinction between "tenure of employment" and "conditions of employment," and attention is called to the use of those terms in Secs. 8(3) and 2(9) of the Act. Having thus asserted this distinction, the argument proceeds that tenure of employment is not embraced within the term "conditions of employment." Assuming that the Act recognizes such distinction for some purposes, it does not follow that such a distinction may properly be made for the purpose of collective bargaining, as defined in Sec. 9(a). "Tenure" as presently used undoubtedly means duration or length of employment. The tenure of employment is terminated just as effectively by a discharge for cause as by a dismissal occasioned by a retirement provision. And in both instances alike, the time of the termination of such tenure is determined by the Company. As already shown, a termination by discharge is concededly a matter for collective bargaining. To say that termination by retirement is not amenable to the same process could not, in our judgment, be supported by logic, reason or common sense. In our view, the contention is without merit.

The Company also concedes that seniority is a proper matter for collective bargaining and, as already noted, has so recognized by its contract with the Union. It states in its brief that seniority is "the very heart of conditions of employment." Among the purposes which seniority serves is the protection of employees against arbitrary management conduct in connection with hire, promotion, demotion, transfer and discharge, and the creation of job security for older workers. A unilateral retirement and pension plan has as its main objective not job security for older workers but their retirement at an age predetermined by the Company, and we

think the latter is as much included in "conditions of employment" as the former. What would be the purpose of protecting senior employees against lay-off when an employer could arbitrarily and unilaterally place the compulsory retirement age at any level which might suit its purpose? If the Company may fix an age at 65, there is nothing to prevent it from deciding that 50 or 45 is the age at which employees are no longer employable, and in this manner wholly frustrate the seniority protections for which the Union has bargained. Again we note that discharges and seniority rights, like a retirement and pension plan, are not specifically mentioned in the bargaining requirements of the Act.

The Company in its brief as to seniority rights states that it "affects the employee's status every day." In contrast, the plain implication to be drawn from its argument is that an employee is a stranger to a retirement and pension plan during all the days of his employment and that it affects him in no manner until he arrives at the retirement age. We think such reasoning is without logic. Suppose that a person seeking employment was offered a job by each of two companies equal in all respects except that one had a retirement and pension plan and that the other did not. We think it reasonable to assume an acceptance of the job with the company which had such plan. Of course, that might be described merely as the inducement which caused the job to be accepted, but on acceptance it would become, so we think, one of the "conditions of employment." Every day that such an employee worked his financial status would be enhanced to the extent that his pension benefits increased, and his labor would be performed under a pledge from the company that certain specified monetary benefits would be his upon reaching the designated age. It surely cannot be seriously disputed but that such a pledge on the part of the company forms a part of the consideration for work performed, and we see no reason why an employee entitled to the benefit of the plan could not upon the refusal of the company to pay, sue and recover such benefits. In this view, the pension thus promised would appear to be as much a

part of his "wages" as the money paid him at the time of the rendition of his services. But again we say that in any event such a plan is one of the "conditions of employment."

The Company makes the far fetched argument that the contributions made to a pension plan "differ in no respect from a voluntary payment that might be made to each employee on his marriage, or on the birth of a child, or on attaining the age of 50, or on enlisting in the armed forces in time of war or on participating as a member of a successful company baseball team," but we think there is a vast difference which arises from the fact that such hypothetical payments are not made as the result of a promise contained in a plan or program. They represent nothing more than a gift. Assume, however, that such supposed payments were made to employees as a result of a company obligation contained in a plan or program. Such an obligation would represent a part of the consideration for services performed, and payments made in the discharge of such obligation would, in our view, be "wages" or included in "conditions of employment."

The Board cites a number of authorities wherein the term "wages" in other fields of law has been broadly construed in support of its conclusion in the instant case that the term includes retirement and pension benefits for the purpose of collective bargaining. While we do not attach too much importance to the broad interpretation given the term in unrelated fields, we think they do show that a broad interpretation here is not unreasonable. For instance, the Board has been sustained in a number of cases where it has treated for the purpose of remedying the effects of discriminatory discharges, in violation of Sec. 8(3) of the Act, pension and other "beneficial insurance rights of employees as part of the employees' real wages and, in accordance with its authority under Sec. 10(c), to order reinstatement of employees with * * * back pay," and has required the employer to restore such benefits to employees discriminated against. See Butler Bros., et al. v. N. L. R. B., 7 Cir., 134 F.2d 981, 985; General Motors Corp. v. N. L. R. B., 3 Cir., 150 F.2d 201, and N. L. R. B.

v. Stackpole Carbon Co., 3 Cir., 128 F.2d 188. In the latter case, the court stated (128 F.2d at page 191) that the Board's conclusion "seems to us to be in line with the purposes of the Act for the insurance rights in substance were part of the employee's wages."

In the Social Security Act, 49 Stat. 642, Sec. 907, 42 U.S.C.A. § 1107, the same Congress which enacted the National Labor Relations Act defined taxable "wages" as embracing "all remuneration * * * [for services performed by an employee for his employer], including the cash value of all remuneration paid in any medium other than cash * * *." This definition has been construed, as the Supreme Court noted, in Social Security Board v. Nierotko, 327 U.S. 358, 365, 66 S.Ct. 637, 90 L. Ed. 718, 162 A.L.R. 1445 (note 17), as including "vacation allowances," "sick pay," and "dismissal pay."

In the field of taxation, pension and retirement allowances have been deemed to be income of the recipients within the Internal Revenue Act definition of wages as "compensation for personal services." 26 U.S.C.A.Int.Rev.Code § 22(a). Thus, in Hooker v. Hoey, D.C., 27 F.Supp. 489, 490, affirmed, 2 Cir., 107 F.2d 1016, the court said: "It cannot be doubted that pensions or retiring allowances paid because of past services are one form of compensation for personal service and constitute taxable income * * *."

The Company in its effort to obtain a construction of Sec. 9(a) favorable to its contention devotes much of its brief to the legislative history of the Act which it is claimed demonstrates that Congress did not intend to subject retirement and pension plans to the bargaining process. In view of what we have said, this argument may be disposed of without extended discussion. It is sufficient to note that we have studied this legislative history and, while there are some portions of it which appear to support the company's position, yet taken as a whole it is not convincing. It would, in our judgment, require a far stronger showing of congressional intent than exists here before we would be justified in placing a construction upon the provision in question which would do violence to the plain words of the statutory requirement and which would result in an impairment of the purpose of the Act. It may be true, as argued by the Company, that retirement and pension plans were employed only to a limited extent in 1935, when the original Act was passed. Such provisions, however, were being generally used at the time of the passage of the amended Act in 1947. And we doubt the validity of the argument that the language of the latter Act cannot be given a broader scope even though Congress used the same phraseology. We do not believe that it was contemplated that the language of Sec. 9(a) was to remain static. Congress in the original as well as in the amended Act used general language, evidently designed to meet the increasing problems arising from the employer-employee relationship. As was said in Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793, 19 Ann.Cas. 705:

"Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth."

The Company places great stress upon the bargaining language used in the Railway Labor Act of 1926, 45 U.S.C.A. § 151 et seq., on the theory that the instant Act is *in pari materia*. It points out that numerous retirement and pension plans were put into effect by the railroads and that they were never subjected to the process of collective bargaining. This showing is made for the purpose of demonstrating that Congress in the enactment of the legislation now before us did not intend to include such matters. In this connection, we think it is pertinent to note that in the Railway Labor Act the bargaining language was quite different from that of the instant legislation. There, it read, "rates of pay, rules, or working conditions." Here, it reads, "rates of pay, wages, hours of employment, or other conditions of employment." A comparison

of the language of the two Acts shows that Congress in the instant legislation must have intended a bargaining provision of broader scope than that contemplated in the Railway Labor Act. Certainly the term "wages" was intended to include something more than "rates of pay." Otherwise, its use would have served no purpose. Congress in the instant legislation used the phrase, "other conditions of employment," instead of the phrase, "working conditions," which it had previously used in the Railway Act. We think it is obvious that the phrase which it later used is more inclusive than that which it had formerly used. Even though the disputed language of the instant Act was open to construction, we think a comparison of the language of these two Acts is of no benefit to the Company.

The Company places much reliance upon a statement from the opinion in J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 339, 64 S. Ct. 576, 88 L.Ed. 762. While the court was not considering a question such as that with which we are now concerned, we think it must be conceded that the language furnishes some support for the Company's position, and if this case stood alone as the sole expression of the Supreme Court relative to the question before us it would at least cause us to hesitate; however, in a later case, United States v. United Mine Workers of America, 330 U.S. 258, 286, 287, 67 S.Ct. 677, 91 L.Ed. 884, the court made a statement which indicates a view contrary to the Company's present position. Again, however, the question here presented was not before the court and we do not regard either of these cases as an expression of the view of the Supreme Court upon the instant question. The support which the Company professes to find in the Case case is at least offset by the court's statement in the United Mine Workers case.

It is our view, therefore, and we so hold that the order of the Board, insofar as it requires the Company to bargain with respect to retirement and pension matters, is valid, and the petition to review, filed by the Company in No. 9612, is denied.

This brings us to the Union's petition for review of the order in No. 9634. Upon issuance of the same, the Union satisfied the condition attached thereto insofar as it pertained to Sec. 9(f) and (g) of the Act, but failed and refused to comply with Sec. 9(h).

On May 14, 1948, the Union filed with the Board a document entitled "Return by United Steel Workers of America to Conditional Order of National Labor Relations Board," in which the Union requested the Board to amend its order by making it unconditional. In this document, the Union alleged "that it had not complied with the requirement of Sec. 9(h) of the Act, as amended, because the Union believes that Sec. 9(h) is unconstitutional and void." The Board by its order entered May 17, 1948, denied the request, saying:

"Upon due consideration of the matter, the Board believes that the Union's request for an amendment rendering the Board's order unconditional must be, and it hereby is, denied. In the absence of authoritative judicial determination to the contrary, the Board assumes the constitutional validity of the provisions of the amended Act."

Thus, we have presented the important and perplexing problem as to the constitutionality of Sec. 9(h), the relevant portion of which provides:

"No investigation shall be made by the Board * * *, no petition * * * shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization * * * unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. The provisions of section 35 A of the Criminal Code shall be applicable in respect to such affidavits."

The Union attacks the constitutionality of Sec. 9(h) on the ground that it is

violative of the Constitution in numerous respects. It asserts (1) that the provision invades the political freedom of Philip Murray (petitioner), as well as that of other officials of the Union of which he is the head, and of the members of such Union, in violation of the First, Ninth and Tenth Amendments; (2) that it constitutes a bill of attainder within the meaning of Article I, Sec. 9, Clause 3; (3) that it deprives the Union, its officials and members of liberty and property without due process of law and arbitrarily discriminates against them in violation of the Fifth Amendment, and (4) that it is unconstitutional because of its vagueness, indefiniteness and uncertainness. The constitutionality of the provision has also been attacked by the National Lawyers Guild in a brief which we have permitted to be filed as amicus curiae.

The Board defends the constitutional power of Congress to require as a condition to the compulsory right of a labor organization to bargain collectively that each of its officers make the required affidavit. It is argued (1) that the withholding of such benefits does not impinge on the constitutional right to self-organization; (2) that the condition imposed and the congressional policy which it effectuates does not invade rights of freedom of speech or freedom of the press, or deny freedom of political belief, activity or affiliation; (3) that Congress could reasonably believe that the policies of the Act, and the security interests of the nation, would not be fostered by the extension of the benefits of the Act to labor organizations whose officers are Communists or supporters of organizations dominated by Communists; (4) that the means adopted by Congress to accomplish such purpose are appropriate; (5) that the language of the provision is sufficiently definite and certain to escape constitutional impairment, and (6) that it does not constitute a bill of attainder.

The constitutionality of Sec. 9(h) has been sustained in National Maritime Union v. Herzog, D.C., 78 F.Supp. 146, and by the District Court for the Southern District of New York, in Wholesale and Warehouse Workers' Union, etc. v. Douds, 79 F.Supp. 563. Each of these cases was decided by a three-Judge statutory court in proceedings wherein it was sought to enjoin the Labor Board from giving effect to the provision in controversy. In the Herzog case the court rendered a lengthy opinion in support of its position, which was approved in the Douds case. In each of the cases there was a dissenting opinion in which the dissenting Judge viewed the provision as unconstitutional. In the Herzog case the court also sustained the constitutionality of Sec. 9(f) and (g). On appeal, the Supreme Court in a Per Curiam order entered June 21, 1948, 334 U. S. 854, S.Ct. 1529, affirmed the statutory court as to these two paragraphs but found it unnecessary to consider the validity of Sec. 9(h).

I find myself in disagreement with my associates. Judge Kerner has written an opinion, concurred in by Judge Minton, upholding the constitutionality of the section. I think to the contrary. Among many Supreme Court cases cited and discussed by the respective parties, there are none which present an analogous situation; in fact, the section is unique in the annals of the entire legislative and judicial field. The cases do teach, however, in unmistakable fashion, especially in recent times, the broad interpretation given the First Amendment and the zealous protection which the Supreme Court has afforded it from impairment or encroachment.

As illustrative, a few cases may be noted. "That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions.. And it is the character of the right, not of the limitation, which determines what standard governs the choice." Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430. "For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." Bridges v. California, 314 U. S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192, 159 A.L.R. 1346. "If there is any fixed

star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, 147 A.L.R. 674. "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." Thornhill v. Alabama, 310 U.S. 88, 101, 60 S.Ct. 736, 744, 84 L.Ed. 1093.

The Board in substance concedes that the section cannot be justified by what the Supreme Court has characterized the "clear and present danger" rule. Bridges v. California, supra, 314 U.S. at page 263, 62 S.Ct. at page 194; Thornhill v. Alabama, supra, 310 U.S. 88, at page 104, 60 S.Ct. 736. Rather, the Board attempts to uphold its validity on the reasoning of the Herzog case that Congress, having bestowed upon labor organizations certain benefits and privileges, had a right to attach as a condition to their enjoyment the requirement contained in Sec. 9(h). The Board in its brief states and restates that the purpose of Congress was to eliminate from the bargaining process Communist-dominated Unions. Its position is stated thus:

"We turn then to the precise questions which may here properly be presented, whether denial of the benefits of the Act to labor organizations whose officers are Communist or members of Communist dominated organizations, or who believe in, or support organizations which advocate violent overthrow of the government, is reasonably related to the objectives which Congress legitimately sought to promote by enactment of the statute, and whether the methods utilized to promote these objectives are appropriate means for their effectuation."

Referring to the opinion in the Herzog case, the Board states:

"The Court concluded that the consequences upon self-organizational activity of wilful non-compliance by a union with conditions which Congress was entitled to impose could not be attributed to Congress or to the Board, but solely to the union itself, and that denial of the benefits of the Act to labor organizations which refused to comply could therefore not be said to deprive those labor organizations of their constitutional right to freedom of association."

Thus, the fallacious premise is laid for the Board's argument that Congress, having endowed labor organizations with certain benefits, was justified in imposing a condition that such benefits should not be enjoyed by Communist-dominated organizations. A hypothetical situation is created which bears no resemblance either to the requirements of the section or to the benefits bestowed by the Act. Sec. 9(h) imposes no obligation upon a Union, Communist-dominated or otherwise; in fact, a Union is without power to comply with the condition which Congress has imposed. This is in marked contrast with Sec. 9(f) and (g), which require the Unions to file certain factual reports as a prerequisite to their right to act as a bargaining agent. The instant section is directed at the individual officers of this far-flung labor organization, each of whom has been empowered to stymie the entire bargaining process and thus deprive the Union of its right to act as bargaining agent. And a single official can do this very thing by refusing to make the affidavit for any reason or no reason. He may refuse solely because of an arbitrary or capricious attitude, because the terms of the statute are so vague as to make it uncertain whether the affidavit can be truthfully made, or because he belongs to the proscribed class. Thus, the section gathers within its devastating reach a Union all of whose officials save one are willing and able to make the affidavit.

The impact which this section has upon employees represented by the Union is even

more pronounced. As illustrative, the Union in the instant situation has been duly selected by some 12,000 employees of an appropriate bargaining unit as their agent. The Board minimizes, in fact almost ignores, their predicament. Their interest is disposed of on the erroneous theory that their rights stem from Congress, and what Congress has given it can take away.

It is well to keep in mind, however, what the Board appears to overlook, that is, that employees have certain constitutional rights irrespective of any benefit bestowed by the Wagner Act or its successor. It has been held that the right "to organize for the purpose of securing redress of grievances and to promote agreements with the employers relating to rates of pay and conditions of work" is a constitutional right, and that the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other material protection is fundamental. Further, that employees have as clear a right to organize and select their representatives for a lawful purpose as an employer has to organize its business and select its own officers and agents. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 627, 81 L.Ed. 893, 108 A.L.R. 1352. And it has been held that the right of workmen or of Unions "to assemble and discuss their own affairs is as fully protected by the Constitution as the right of business men, farmers, educators, political party members or others to assemble and discuss their affairs and to enlist the support of others." Thomas v. Collins, 323 U.S. 516, 539, 65 S.Ct. 315, 327, 89 L.Ed. 430. And as employees have a constitutional right to organize, to select a bargaining agent of their own choosing and, if members of a Union, to elect the officials of such Union, so I would think that the bargaining agent when so selected had a right of equal standing to represent for all legitimate purposes those by whom it had been selected. The employees in the instant situation have availed themselves of constitutional rights in selecting the Union as their bargaining agent and in the election of its officials.

At this point it is pertinent to observe that the Wagner Act was enacted primarily for the benefit of employees and not for Unions. The latter derive their authority from the employees when selected as their bargaining agent, rather than from the law. The very heart of the Act is contained in Sec. 7, which provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing * * *." This was not a Congress-created right but the recognition of a constitutional right, which Congress provided the means to protect. This is clearly shown by the declared policy of the Act that commerce be aided "by encouraging the practice and procedure of collective bargaining and by protecting the exercise of workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

In my view, the condition attached to the Board's order in the instant case is a direct and serious impairment upon these constitutional rights of both the employees and the Union. The rights of the former to organize, select a bargaining agent of their own choosing and elect officers of the Union have been reduced to a state of meaningless gesture. See Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 570, 50 S.Ct. 427, 74 L.Ed. 1034, and National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, 301 U.S. 1, at page 34, 57 S.Ct. 615.

In order to comply with the condition of the Board's order, they must select a bargaining agent not of their own choosing but one which conforms to the pattern which Congress has prescribed. The fundamental right to elect officers of their Union, untrammeled and unfettered, has been made subservient to the congressional edict as to the character of officials which will be tolerated. Not only does the section represent an intrusion by Congress in the internal affairs of a Union and its members, but it is legislative coercion expressly designed to compel Union members to

forego their fundamental rights. "Freedom of speech, freedom of the press, and freedom of religion all have a double aspect—freedom of thought and freedom of action. Freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind." Murphy, J., dissenting in Jones v. City of Opelika, 316 U.S. 584, 618, 62 S.Ct. 1231, 1249, 86 L.Ed. 1691, 141 A.L.R. 514, subsequently a majority opinion of the court in 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290.

Contrast this philosophy with that which the Board attributes to the Act, as evidenced by the following statement: "The assumption is that if the facts are known through this filing procedure, union members * * * will soon remove Communists from leadership rather than allow themselves to be precluded from enjoying the benefits of the Act. Northern Virginia Broadcasters, Inc., 75 N. L. R. B. No. 2."

But it is argued that employees have in their own hands the means of obtaining compliance by the selection of a bargaining representative whose officers are able and willing to make the affidavit. Assuming that employees are always members of a Union which acts as their bargaining agent, which is not the case, it is a shallow and unrealistic argument. How can employees when they select a Union as their bargaining agent know that each of its officers will be able and willing to make the affidavit? And how can they compel such officers to do so subsequent to their election? How could the members rid their Union of an officer who refused to make the affidavit, for good reason or no reason? The record before us does not disclose who or how many officers refused to make the affidavit. Assuming, however, that it was Philip Murray, president of a national labor organization of which the instant Union is an affiliate, how long, I wonder, would it take the 12,000 employees of the bargaining unit here involved to replace him with an officer who would comply? The Act provides that no election shall be directed in any bargaining unit wherein a valid election has been held within the preceding twelve-month period. Sec. 159(c)

(3). I do not think that the constitutional rights of the employees or the Union can be suspended in mid-air for a time of such dubious and uncertain length.

The upshot of the whole situation is that employees when members of a Union are under a continuing compulsion to elect officers who will meet the congressional prescription in order that their Union may remain in the good graces of the Board, and they must do this even though it be contrary to their belief, conscience and better judgment. Experience, ability, honesty and integrity of candidates for official positions in the Union must be cast aside.

For similar reasons, the section also affects, and I think seriously impairs, the fundamental rights of Union officials. The affidavit prescribed is directed at the belief entertained by the affiant in contrast to conduct, behavior or action. Assuming arguendo, however, that it has no effect upon the constitutional right of an officer who refuses to make it, what about the effect upon those who comply? The right of the officers of a Union to manage and control its affairs is a basic right and I would suppose to be exercised in accordance with the principle of majority rule. The section, however, limits the rights of the officers of a Union by making them dependent upon the affirmative action of each officer. The officers who make the affidavit, even though in the majority, are no better off than if they had refused. More than that, the affidavit, particularly in view of its vague and uncertain terms, is calculated to create in the mind of the maker a continuous apprehension lest the affiant make some expression, perform some act, have some association or indulge in conduct which might later be used as evidence to show that the affidavit was false. As was said in the dissenting opinion in Minersville School District v. Gobitis, 310 U.S. 586, 606, 60 S.Ct. 1010, 1018, 84 L.Ed. 1375, 127 A.L.R. 1493:

"The Constitution expresses more than the conviction of the people that democratic processes must be preserved at all costs. It is also an expression of faith and a command that freedom of mind and spirit must be preserved, which government must

obey, if it is to adhere to that justice and moderation without which no free government can exist."

In my view, Congress has attempted to do indirectly what it could not do directly under the Constitution. "In approaching cases, such as this one, in which federal constitutional rights are asserted, it is incumbent on us to inquire not merely whether those rights have been denied in express terms, but also whether they have been denied in substance and effect." Oyama v. California, 332 U.S. 633, 636, 68 S.Ct. 269, 270.

Many cases are cited and relied upon in support of the argument that Congress was reasonably justified in attaching the condition contained in Par. (h) as a prerequisite to the right of employees to compulsory bargaining. Without attempting to mention all of such cases, a few may be noted as typical. Turner v. Williams, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979; Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002; Hamilton v. Board of Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343; United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754. The strongest of these cases, in my judgment, is the Mitchell case. There, the question involved was the constitutionality of the Hatch Act, now 18 U.S.C.A. § 594 et seq., which forbade government employees to engage in political activity, admittedly a right protected by the First Amendment. There, the favor bestowed by Congress was governmental employment, and an employee had the choice between accepting the favor and foregoing his right to engage in political activity, or in declining the governmental favor and exercising such right. This is quite a contrast to the instant situation where the grant is bestowed upon the employees with the power lodged in a third person to prevent them from obtaining the benefit.

Turner v. Williams, supra, is of no benefit to the Board's position. There, it was held that Congress could properly make the privilege of immigration turn upon the political beliefs of the immigrant. As later pointed out in Bridges v. Wixon, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103, "Since an alien obviously brings with him no constitutional rights, Congress may exclude him in the first instance for whatever reason it sees fit." In other words, an alien, at least in the first instance, is not entitled to the benefits of the Bill of Rights. In the Hawker case, supra, it was held that a State could constitutionally prevent persons who had previously been convicted of a felony from practicing medicine. The decision goes no further than holding that the State under its police power had the authority to fix the standards to be met by one who sought the privilege of administering to the health and well being of its citizens. In Hamilton v. Board of Regents, supra, it was held that the State might properly bar from its colleges persons who refused to attend classes in military training. Again, the condition attached to the privilege could be met at the discretion of the person who sought to become the recipient of the State's favor.

A more relevant pronouncement is that contained in Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457. There, the court held that Congress was without constitutional power to do indirectly what it was prohibited from doing directly in a matter wherein it had attached a condition to be performed as a prerequisite to the receipt of a benefit. The court 271 U.S. on page 593, 46 S.Ct. on page 607 stated:

"May it stand in the conditional form in which it is here made? If so, constitutional guaranties, so carefully safeguarded against direct assault, are open to destruction by the indirect, but no less effective, process of requiring a surrender, which, though, in form voluntary, in fact lacks none of the elements of compulsion. Having regard to form alone, the act here is an offer to the private carrier of a privilege, which the state may grant or deny, upon a condition which the carrier is free to accept or reject. In reality, the carrier is given no choice, except a choice between the rock and the whirlpool—an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden."

The Board reviews at length the congressional history and other data for the purpose of demonstrating that Congress was reasonably justified in attaching the condition as a prerequisite to the enjoyment of the benefits which it had provided. As already pointed out, however, it did not give such beneficiaries the option of compliance or noncompliance. The result of the congressional inquiry is summarized in the Board's brief as follows:

"Congress was not unaware that Communist officers of labor organizations sometimes effectively represent the economic interests of members in collective bargaining, and in grievance adjustment, and that to this extent their activities do tend to effectuate the policies of the Act. But Congress believed that whatever public value Communist leadership of labor unions might have in this respect was clearly outweighed by the danger that they might, on other occasions, utilize their power and influence for purposes inimical to the policies of the Act and to national security."

Thus, notwithstanding this congressional recognition that some labor organizations with Communist officials were willing and able to cooperate in effectuating the policies of the Act, it placed such Unions in the same category with those whose officials were unwilling to do so, and denied to each class alike the benefits and facilities which Congress had provided. By the same token, the rights of loyal and patriotic employees, as well as Union officials, were made to rest upon the affirmative act of "each" officer of the Union. So, if employees of a bargaining unit are willing to submit to the pressure which Par. (h) engenders and are fortunate enough to select a bargaining agent, each of whose officers will make the affidavit, such employees receive the benefits of the Act. Employees, however, who insist on maintaining their fundamental right to select a bargaining agent, or who for any reason have not succeeded in selecting a bargaining agent "each" officer of which is willing to comply, are deprived of the congressional grant. The same comparison may be made between competing Unions. One Union is permitted to represent its employees and the other is not. In my view, a statute which creates such a situation, especially considered in connection with its vague and indefinite requirements, is so arbitrarily discriminatory as to violate the due process clause of the Fifth Amendment. As was said in Hurtado v. California, 110 U.S. 516, 535, 4 S.Ct. 111, 121, 292, 28 L.Ed. 232:

"It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case * * *."

See also Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081, and United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252.

According to the Board's argument, the congressional target was Communist-dominated Unions. The legislative fire, however, was not directed merely at those whom it intended to disable. The range included a scope of far greater area. It encompassed what it recognized as good Communists as well as the bad. And of more importance it included countless patriotic employees and Union officials who carried no taint of Communism. All alike were made to suffer the same fate and required to answer for the sins of a few, even one. From a practical aspect, it is not unlike throwing a barrel of apples in the river in order to get rid of one that is rotten. From a legal viewpoint, it has the effect of arbitrarily singling out for legislative action a particular person or group because of the personal belief of their associates. As was said in Schneiderman v. United States, 320 U.S. 118, 136, 63 S.Ct. 1333, 1342, 87 L.Ed. 1796:

"* * * under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles."

That the section is void because of its vague and uncertain language appears plain. This is so both as to the persons within its scope and the subject matter of the required affidavit. "There must be ascertainable standards of guilt. Men of common intelligence cannot be required to

guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act, Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888, or in regard to the applicable tests to ascertain guilt." Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670.

The section applies to "each officer of such labor organization and the officers of any national or international labor organization." Such officers are neither enumerated nor defined, either in the section in controversy or otherwise in the Act. While the record does not purport to disclose a list of such officers, it does show that the agreement between the Union and the Company was signed by six officials of the national organization, including Philip J. Murray, as president, and by nine officers of the local Union. From the agreement it is discernible that there are twenty members of the grievance committee with authority to negotiate on the part of the Union, twenty assistant members of the grievance committee, and a safety committee of equal number authorized to represent the Union in its dealings with the company concerning safety matters. I assume that there are hundreds of officers between the bottom and the top of this vast labor organization. The importance of the word "officer" is evident, particularly in view of the fact that "each officer" is given the power by refusal to make the affidavit to paralyze a Union and its members.

That those who come within the scope of the word "officer" have been left in a state of uncertainty and doubt is well illustrated by an opinion of the Labor Board, In The Matter of Northern Virginia Broadcasters, Inc., etc., and Local Union No. 1215, in the National Brotherhood of Electrical Workers, page 11, volume 75, Decisions and Orders of the N.L.R.B. In that case, the Regional Director, following instructions of the General Counsel of the Labor Board, dismissed the proceeding for failure of compliance with Sec. 9(h) by the American Federation of Labor, with which the local Union was affiliated. The Board held that compliance by officials of the national organization was not required, on the ground that such a construction would make the section unworkable. There was a concurring and a dissenting opinion. The point is that the Board itself had great difficulty in deciding who were included in the term "officer," and the decision when made was by a divided Board. This emphasizes the difficult problem presented to officers of a Union in attempting to determine whether they are within the scope of persons required to make the affidavit.

The facts required to be stated in the affidavit are of such an uncertain and indefinite nature as to afford little more than a fertile field for speculation and guess. What is meant by a "member of the Communist party or affiliated with such party"? How and when does a person become a member of that party, or any other party for that matter? And what does it mean to be "affiliated"? The Supreme Court, in Bridges v. Wixon, supra, devoted several pages to the meaning to be attributed to the word "affiliation," as used in the deportation statute. The court's discussion is convincing that its meaning would be quite beyond the reach of the ordinary citizen. As close as the court came to defining the term was (326 U.S. at page 143, 65 S.Ct. at page 1447), "It imports, however, less than membership but more than sympathy." The court pointed out that cooperation with Communist groups was not sufficient to show affiliation with the party.

What does the word "supports" include? Does a person by voting for the candidates of a party or by attending its meetings and making contributions, or by buying its literature or books, become a supporter thereof? And how can the ordinary person possibly be expected to make an affidavit that he is not a member of any organization that believes in or teaches the overthrow of the United States Government "by any illegal or unconstitutional methods"? These are matters which perplex the Bench and the Bar, and the diversity of opinion among Judges as to what is illegal and unconstitutional often marks the boundary line between majority and dissenting opinions.

See the recent case of United States v. Congress of Industrial Organization, 335 U.S. 106, 68 S.Ct. 1349 and particularly the

concurring opinion by four members of the court, which held unconstitutional Sec. 313 of the Federal Corrupt Practices Act of 1925, as amended by Sec. 304 of the instant Act, 2 U.S.C.A. § 251, because of the vagueness and uncertainty of the phrase, "a contribution or expenditure in connection with any election * * *." The discussion is quite relevant to the instant situation. On page 153 of 335 U.S., on page 1372 of 68 S.Ct. it is stated:

"Vagueness and uncertainty so vast and all-pervasive seeking to restrict or delimit First Amendment freedoms are wholly at war with the long-established constitutional principles surrounding their delimitation. They measure up neither to the requirement of narrow drafting to meet the precise evil sought to be curbed nor to the one that conduct proscribed must be defined with sufficient specificity not to blanket large areas of unforbidden conduct with doubt and uncertainty of coverage. In this respect the Amendment's policy adds its own force to that of due process in the definition of crime to forbid such consequences. * * * Only a master, if any, could walk the perilous wire strung by the section's criterion."

The Board makes no serious argument but that the section is vague and uncertain as charged. It attempts to excuse its infirmities by contending (1) that its vagueness is cured by Sec. 35-A of the Criminal Code, now 18 U.S.C.A. § 1001, and (2) that the rule against vagueness and uncertainty is not applicable because the statute is not compulsory. No authorities are cited which sustain either proposition.

The substance of the argument in favor of the first proposition is that an officer of a Union need not be too much concerned about the truthfulness of the affidavit which he makes because he can only be convicted under Sec. 35-A of the Criminal Code for "knowingly and willfully" making a false affidavit. In the Board's own words, "Clearly, no affiant could successfully be prosecuted under this section for filing a false affidavit under Sec. 9(h) unless it could be proved that he knowingly lied in making the averments contained in his affidavit." This statement, so I think, could be made concerning every prosecution for perjury. The Board makes the further puerile suggestion that an affiant need not be afraid of a groundless prosecution because "our law provides adequate modes of redress to victims of malicious prosecution."

To me, this argument is shocking and should be repudiated in no uncertain terms. Bluntly stated, it means that an officer of the Union who makes the affidavit need not be concerned with the sanctity of his oath because of the unlikelihood of conviction in case of a prosecution for perjury. He need not be afraid because the only danger which he assumes is the hazard of a prosecution which when unsuccessful leaves him as the possessor of a damage suit against his accuser in an action for malicious prosecution. This argument is a persuasive indication that the section should be invalidated because of its vagueness and uncertainty.

Neither do I think there is any merit in the suggestion that the authorities as to vagueness and uncertainty are inapplicable because the making of the affidavit is voluntary. In reality, the making of the affidavit is indispensable if the Union is to survive and the rights of its members protected. It is made at the invitation of Congress, and I can discern no reason why the rule as to uncertainty and vagueness should not be applied. The reason for the rule, as the authorities show, is that persons of ordinary intelligence may not be required to guess or speculate at the meaning of a statute, and every reason of which I can think which entitles the maker of a compulsory affidavit to such information exists in the instant situation. The need for this information is emphasized from the fact that the section serves notice that one who makes a false affidavit is subject to prosecution for perjury.

I would hold Sec. 9(h) unconstitutional and direct the elimination of the condition which the Board has attached to its order.

KERNER, Circuit Judge.

I concur in Judge MAJOR'S opinion that the Board properly determined that pension and retirement plans constitute part of the subject matter of compulsory

collective bargaining under the Act, but I am not persuaded that § 9(h) of the Act is invalid.

The Union's principal contention is that the condition imposed by the Board's order and the Congressional policy embodied in § 9(h) which the order effectuates, invade the right to freedom of speech and deny freedom of political belief activity. It insists that § 9(h) "is an attempt to restrict freedom of belief"; that the section is "primarily if not exclusively a restraint upon opinion and belief," and that it "imposes sanctions for the alleged evil of harboring 'dangerous thoughts.'"

In support of its contention the Union cites among others the cases appearing in the margin.[1] A study of these cases discloses that in them the court was concerned with the effect of legislation, or judicial action, which imposed a prior restraint upon speech, press or assembly, or which restricted the occasion for permissible exercise of speech, press or assembly, or which punished the individuals for having published their views.

It is to be borne in mind that the Act was not passed because Congress disapproved of the views and beliefs of Communists, but because Congress recognized that the practices of persons who entertained the views presently to be discussed, might not use the powers and benefits conferred by the Act for the purposes intended by Congress, so, in my view, the question is whether Congress, by providing that the facilities of the Board shall not be available to a labor organization unless each of its officers shall file an affidavit with the Board that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, does not belong to, or support any organization believing in or teaching the overthrow of the United States Government by force or by any illegal or unconstitutional methods, violated the Constitution.

It is to be remembered that neither belief, nor speech, nor association is the subject matter of the policy of § 9(h) and that neither that section nor the Board's order imposes any limitation upon what any labor leader may think or say, nor does the order or § 9(h) attempt to prohibit or restrain anyone from joining or supporting any organization. Neither the order nor § 9(h) denies to Communists the right to speak and to publish freely their views, beliefs and opinions. They may speak as they think. There is no invasion of political rights. Communists are not denied the right to continue to remain members of the Communist Party. The section does not make such affiliation or beliefs punishable either criminally or by the imposition of civil sanctions. In such a situation the cases cited by the Union are inapplicable and hence not controlling here, but as was said in National Maritime Union v. Herzog, D.C., 78 F.Supp. 146, 163, "It is therefore clearly wrong to say that § 9(h) impinges on a union officer's freedom of speech."

█ It is unquestioned that Congress may conclude that the policies of the Act, i.e., stimulation of commerce and the security interests of the nation would be deterred by an extension of the benefits of the Act to labor organizations dominated by officers who are Communists or supporters of organizations dominated by Communists, and that it may take steps to effectuate its conclusions. In fact the "congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Bur-

[1] Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Herndon v. Lowry, 301 U.S. 242, 57 S. Ct. 732, 81 L.Ed. 1066; Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; West Virginia State Board of Education v. Barnette, 319 U. S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; and Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148.

dens and obstructions may be due to injurious action springing from other sources. The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' * * *. That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.'" National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 36, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Nevertheless, the Union contends that § 9(h) contravenes the guarantees of the Ninth and Tenth Amendments. It insists that the instant case involves more than a regulatory measure, and it argues that if the statute is viewed as one "restricting expression of advocacy," it fails to meet the clear and present danger test.

■ While it is true that "a law applied to deny a person a right to earn a living or hold any job because of hostility to his particular race, religion, beliefs, or because of any other reason having no rational relation to the regulated activities," cannot be supported under the Constitution, Kotch v. River Port Pilot Commissioners, 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093, yet Congress has the power to withhold benefits which it confers for the accomplishment of legitimate purposes within its constitutional powers from those who, it has cause to believe, may utilize those benefits for directly opposite purposes. For example, in Turner v. Williams, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979, it was held that Congress could properly make the privilege of immigration turn upon the political beliefs of the immigrant, and in United Public Workers v. Mitchell, 330 U.S. 75, 67 S. Ct. 556, 91 L.Ed. 754, it was held that in the exercise of its power to promote the efficiency of the public service, Congress could properly bar from public employment persons who exercised their constitutional right to engage in political activity. And in Oklahoma v. United States Civil Service Commission, 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794, it was held that Congress in the exercise of its powers to "fix the terms upon which its money allotments to states shall be disbursed," could constitu-

tionally deny allotments to states which refuse to remove from their payrolls employees who engage in political activity. See also In re Summers, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795; Hamilton v. Board of Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343; Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002; State of Ohio ex rel. Clarke v. Deckebach, 274 U.S. 392, 47 S.Ct. 630, 71 L.Ed. 1115; and Kotch v. River Port Pilot Commissioners, supra. And where factors relevant to the attainment of legitimate legislative policies are shown, their use as a basis for distinction is not to be condemned. Hirabayashi v. United States, 320 U.S. 81, 101, 63 S.Ct, 1375, 87 L.Ed. 1774. That being so, I think it well to inquire whether there are factors reasonably related to the attainment of the objectives which Congress sought to promote.

■ Unquestionably, the Labor Management Relations Act, 1947, 61 Stat. 136, was designed to lessen industrial disputes. This purpose is clearly shown in the declaration of policy, § 1(b) of the Act, and in the amendment to the findings and policies contained in § 1 of the National Labor Relations Act.

Prior to the passage of the National Labor Relations Act, employers were free to discharge employees for joining labor organizations, and to refuse to bargain collectively with labor organizations which represented their employees. And it is clear that when Congress enacted that Act it sought to minimize strikes in industries affecting commerce by promoting the process of collective bargaining as a practice conducive to friendly adjustments of disputes over wages, hours and working conditions between employers and employees. In doing this, Congress imposed new obligations upon employers and provided administrative machinery for the enforcement of those obligations, but it did not impose those duties because it was under a constitutional obligation to employees or labor organizations to do so. On the contrary, the statute was enacted solely because Congress deemed the imposition of those duties desirable as a means of protecting the public interest in the free flow of commerce, but the benefits

of the Act could not be extended to shield concerted activities which Congress had not intended to protect, National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Southern Steamship Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246, and any benefit which employees or labor organizations derived from the enforcement of these public rights was entirely incidental to the public purposes which enforcement was designed to achieve. True, under the Act, the Board acts in a public capacity, but not for the adjudication of private rights; rather it exists to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining. The entire scheme of the statute emphasizes this point, and the Supreme Court has so held, National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed 1271, 133 A.L.R. 1217; and National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579.

■ Before the enactment of § 9(h), hearings were conducted by Congressional committees which showed that Communists did not view labor unions primarily as instrumentalities for the attainment of legitimate economic aims; that certain practices of some labor organizations whose officers were members of or supporters of the Communist Party tended to foment industrial unrest and strife; and that these practices were inimical to the purposes for which the protection of the Act had been granted. From the evidence thus produced and considered Congress believed that Communists and their supporters and persons who advocate the violent overthrow of the Government, when they attain positions of power and leadership in a labor organization might not practice collective bargaining as a method of friendly adjustment of employer-employee disputes, but instead might use their position as a vehicle for promoting dissension and strife between employers and employees, and that Communists and their supporters and persons who advocate violent overthrow of the Government, if in control of labor organizations, might provoke strikes disruptive of commerce, not for the purpose of improving the economic lot of union members, but to develop political power to achieve political ends, and hence, Congress, in the exercise of its discretion, concluded that extension of the benefits of the Act to such labor organizations would not serve to promote the policies of the Act, but might endanger national interests. The reasonableness of that conclusion was for Congress to determine, North American Co. v. Securities & Exchange Commission, 327 U.S. 686, 708, 66 S.Ct. 785, 90 L.Ed. 945, and since there existed a substantial basis in fact for the conclusion reached by Congress, it seems to me that it was rational for Congress to conclude that members of the Communist Party or persons affiliated with such party who believe in and teach the overthrow of the United States Government by force or by any illegal or unconstitutional methods were more likely than others to misuse the powers which inhere in union office. Hence I conclude that Congress acted within its constitutional powers.

■ The point is made that the section is invalid because the phrases "any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods," "affiliated with," and the word "supports" are vague and indefinite and must fall before the First, Fourth and Fifth Amendments. For the reasons set forth in National Maritime Union v. Herzog, supra, I think the contention lacks merit. In addition, I believe that the statute is as specific as the nature of the problem permits. Compare Dunne v. United States, 8 Cir., 138 F.2d 137, 143. Moreover, the language is not so vague that men of common intelligence would have to guess at its meaning and differ as to its application. It requires only that persons who knowingly engage in the activities set forth in § 9(h), or who knowingly believe in the enumerated doctrines, or who knowingly support organizations which disseminate such doctrines, shall not obtain access to the machinery set up by Congress for the purpose of

advancing a specific public policy; hence if an affiant honestly believes that he is not affiliated with the Communist Party, that he does not support any organization which to his knowledge teaches the overthrow of the United States Government by means which he knows to be illegal or unconstitutional, such an affiant would be in no danger of conviction under Sec. 35(A) of the Criminal Code, now 18 U.S.C.A. § 1001. Compare United States v. Gilliland, 312 U.S. 86, 91, 61 S.Ct. 518, 85 L.Ed. 598; Screws v. United States, 325 U.S. 91, 101-105, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; See also United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877.

█ The point is made that § 9(h) is a bill of attainder, because, so it is said, the section proceeds not by way of defining a harmful activity and setting up sanctions against such activity, but by way of a legislative declaration of the guilt of individuals and groups with respect to engaging in such activities.

█ In my opinion this contention is unsound. A bill of attainder is a legislative act which inflicts punishment without a judicial trial. Cummings v. The State of Missouri, 4 Wall. 277, 323, 71 U.S. 277, 323, 18 L.Ed. 356. Section 9(h) does not rest upon any finding of guilt, but like the disqualification of convicted felons from medical practice in Hawker v. New York, supra, and the disqualification of aliens from operating poolrooms in State of Ohio ex rel. Clarke v. Deckebach, supra, it operates not to impose punishment but to safeguard important public interests against potential evil. And as was said by Mr. Justice Murphy, "nothing in the Constitution prevents Congress from acting in time to prevent potential injury to the national economy from becoming a reality." North American Co. v. Securities & Exchange Commission, supra, 327 U.S. at page 711, 66 S.Ct. at page 799.

I conclude the petitions to set aside the Board's order ought to be denied and the request for its enforcement granted.

MINTON, Circuit Judge, concurs in this opinion.